COPY

1  Paul K. Schrieffer (CSB#151358)
   E-MAIL: pksllp.com
2  Rena M. Stone (CSB# 117090)
   E-MAIL: rms@pks.llp.com
3  P.K. Schrieffer LLP
   100 N. Barranca Avenue, Suite 1100
4  West Covina, CA 91791
   Telephone: (626) 373-2444
5  Facsimile: (626) 974- 8403

6  Attorneys for Plaintiffs
   Liberty Corporate Capital, Ltd.
7

FILED
CLERK, U.S. DISTRICT COURT

MAR 2 9 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10 LIBERTY CORPORATE CAPITAL,          CV11   02626 ODW (FFMx)
   Ltd.,
11                                      Case No.
             Plaintiff,
12                                      ASSIGNED FOR ALL PURPOSES
                                        TO:
13 vs.

14 CALIFORNIA TAU CHAPTER OF            COMPLAINT FOR
   SIGMA ALPHA EPSILON                  DECLARATORY JUDGMENT
15 FRATERNITY AT CALIFORNIA
   POLYTECHNIC STATE
16 UNIVERSITY, SAN LUIS OBISPO,
   ADAM MARSZAL, JAMIE
17 MERKLER, CHRISTOPHER
   PERKINS, MATT SILVA, HAITHEM
18 IBRAHIM, MATTHEW FAULKNER,
   H. SCOTT STARKEY and JULIA
19 STARKEY, Individually and as co-
   administrators of the ESTATE OF
20 CARSON L. STARKEY ,

21           Defendants.

22

23       Plaintiff, Liberty Corporate Capital, Ltd. ("Liberty"), by and through

24 counsel, and for its Complaint for Declaratory Judgment against Defendants,

25 California Tau Chapter of Sigma Alpha Epsilon Fraternity at California

26 Polytechnic State University, San Luis Obispo ("Chapter" or "California Tau

27 Chapter"), Adam Marszal, Jamie Merkler, Christopher Perkins, Matt Silva,

28 Haithem Ibrahim, Matthew Faulkner ("Chapter Member Defendants") and H.

---

1
**COMPLAINT FOR DECLARATORY JUDGMENT**
F:\ACTIVE FILES\LIB-LIBERTY MUTUAL IN LONDON\LIB.126-STARKEY\PLEADINGS\Complaint for Declaratory Judgment.doc

1  Scott Starkey and Julia K. Starkey, individually and as co-administrators of the

2  Estate of Carson L. Starkey (collectively "Estate"), alleges as follows:

3  **I.    Nature of the Action**

4      1.    This is an action pursuant to 28 U.S.C. § 2201 for a declaratory

5  judgment to determine the rights and obligations as between Liberty, the Chapter

6  and Chapter Member Defendants under a general liability insurance policy

7  ("Policy") issued to Sigma Alpha Epsilon Fraternity, Inc. ("National

8  Organization"), and with respect to a state court lawsuit between the above

9  captioned defendants and others following the alcohol-related hazing death of

10  Carson L. Starkey ("Starkey") on December 2, 2008 ("Underlying Action").

11      2.    In that lawsuit the Plaintiffs allege Starkey died as a result of acute

12  alcohol poisoning after he was hazed and forced to consume alcohol by Chapter

13  members as part of a Chapter Big Brother event called "Brown Bag Night".  (The

14  Starkey's First Amended Complaint is hereafter referred to as the "Starkey

15  Complaint").  (True and accurate copies of the Policy and the Starkey's First

16  Amended Complaint are attached hereto as Exhibits A and B, respectively).

17      3.    In this action, Liberty seeks a declaration that it owes no duty to

18  defend or indemnify the Chapter or the Chapter Member Defendants with regard

19  to the allegations in the Starkey Complaint because the Chapter and Chapter

20  Member Defendants do not qualify as "insureds" under the Policy for hazing and

21  alcohol related claims like those alleged.  The Policy also excludes all coverage to

22  those who participate in hazing or direct others to participate in hazing.

23  Furthermore, the Policy does not cover claims arising out of underage drinking or

24  other violations of the National Organization's alcohol policies.

25      4.    In the alternative, Liberty seeks a declaration that the Policy provides

26  indemnity only insurance and is excess to other insurance available to the Chapter

27  and Chapter Member Defendants.

28

## II. Jurisdiction and Venue

5.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the Starkey Complaint occurred in the Central District of California.

## III.    The Parties

7.     Plaintiff Liberty is a United Kingdom corporation, and is a citizen and resident of the United Kingdom. Liberty exists and was incorporated and formed under the laws of the United Kingdom, with its principal place of business at Fifth Floor, One Minster Court, Mincing Lane, London, EC3R7AA. Liberty is the lead underwriter and one of the several Underwriters at Lloyd's London subscribing to the Policy, Certificate No. 07JFR333-27-L. It is a non-resident surplus lines insurer engaged in the insurance business in the State of California. Liberty files this action individually, and not in a representative capacity.

8.     At the time of the events alleged in the Starkey Complaint, the Chapter was the local chapter of the Sigma Alpha Epsilon Fraternity at California Polytechnic State University, San Luis Obispo ("Cal Poly"), and consisted of the Members identified in Exhibit C attached hereto and incorporated herein by reference.

9.     Defendant Adam Marszal is a citizen of the state of California residing at 7160 Sutter Avenue, Carmichael, California. He is a named Defendant in the Starkey's Complaint. On information and belief Mr. Marszal is being defended in the Underlying Action by another insurer. Claims against Mr. Marszsal are still pending.

10.     Defendant Jamie Merkler is a citizen of the State of California residing at 3943 Tambar Road, San Diego, California. He is a named Defendant

**COMPLAINT FOR DECLARATORY JUDGMENT**

in the Starkey's Complaint.  On information and belief Mr. Merkler is being defended in the Underlying Action by another insurer.  Claims against Mr. Merkler are still pending.

11.    Defendant Christopher Perkins is a citizen of the State of California residing at 903 Old Town Court, Cupertino, California .  He is a named Defendant in the Starkey's Complaint.  On information and belief Mr. Perkins is being defended in the Underlying Action by another insurer.  Claims against Mr. Perkins are still pending.

12.    Defendant Matt Silva is a citizen of the State of California residing at 360 Red Maple Drive, Danville, California.  He is a named Defendant in the Starkey's Complaint.  On information and belief Mr. Silva is being defended in the Underlying Action by another insurer.  Claims against Mr. Silva are still pending.

13.    Defendant Haithem Ibrahim is a citizen of the State of California residing at 760 Glorietta Blvd., Lafayette, California.  He is a named Defendant in the Starkey's Complaint.  On information and belief Mr. Ibrahim is being defended in the Underlying Action by another insurer.  Claims against Mr. Ibrahim were settled in the Underlying Action for $500,000, the limits of his primary insurance.

14.    Defendant Matthew Faulkner is a citizen of the State of California residing at 1900 Brokaw Avenue, Corcoran, California.  He was joined in the Underlying Action through a third party complaint filed by the National Organization.  On information and belief Mr. Faulkner is being defended in the Underlying Action by another insurer.  Claims against Mr. Faulkner are still pending.

15.    H. Scott Starkey and Julia K. Starkey are alleged in the Starkey Complaint to be the parents of the decedent, Carson L. Starkey, and duly appointed co-administrators of Starkey's estate by a court of competent

jurisdiction in Travis County, Texas.  Upon information and belief, H. Scott Starkey and Julia K. Starkey are citizens of the State of Texas.

### IV.   Factual Background

16.    Liberty incorporates by reference the allegations of all preceding paragraphs as though plead here.

17.    The Starkey Complaint alleges that on December 1, 2008 the Chapter held a "Brown Bag Night" event, at which Chapter pledges, including Starkey, were ordered to sit in a circle in a garage and each consume an entire bottle of hard alcohol selected by their "Big Brother" in the span of approximately 90 minutes while Chapter Members "stood watch." *Exhibit B, Starkey Complaint,* ¶¶ 37-43.

18.    It is alleged that as part of the pledge event the Chapter Members also provided the group of pledges a bottle of "151 proof Everclear liquor" and placed a bucket in the center of the room to collect vomit. *Id.* at ¶¶ 42-43

19.    The Starkey Complaint alleges that at the time of the "Brown Bag Night" all of the Chapter pledges, including Starkey, were under the legal age to consume alcohol. *Id.* at ¶ 36.

20.    The Starkey Complaint alleges that during the course of the "Brown Bag Night" Starkey became ill from excessive, forced alcohol consumption at the pledge event and "within a short period of time became unresponsive." *Id.* at ¶ 45.

21.    Certain Chapter Members then allegedly decided to drive Starkey to the hospital to obtain medical care but aborted the trip and returned to the premises where the pledge event was being held. *Id.* at ¶ 47.

22.    Starkey was then allegedly placed in a utility room where he was found unresponsive the next morning. *Id.* at ¶ 48-49.

23.    It is alleged Starkey was taken to the hospital, where he was pronounced dead from "acute alcohol poisoning." *Id.* at ¶ 49-50.

24.    The Starkey Complaint alleges that certain Chapter Member Defendants were criminally charged with hazing and illegal provision of alcohol to a minor as of a result of their actions at the pledge event. *Id.* at ¶ 52.

25.    The Starkey Complaint alleges that the Chapter and the Chapter Member Defendants are liable for Starkey's death because they (a) negligently failed to manage the provision and use of alcohol at Chapter pledge events in a reasonably prudent manner, (b) violated Penal Code Section 245.6, which is commonly known as "Matt's Law" and makes it illegal to haze, (c) breached a legal duty not to haze Starkey and therefore are negligent *per se*, (d)  negligently failed to reasonably care for Starkey and render services reasonably calculated to prevent his death, and (e) negligently failed to exercise reasonable care to prevent further harm to Starkey . *Exhibit B, Starkey Complaint,* ¶¶ 72-117.

26.    Starkey's Estate seeks compensatory, punitive and exemplary damages for Starkey's injuries including future financial support, loss of gifts and benefits, funeral and burial expenses, loss of love and companionship, loss of training and guidance, medical expenses, and lost earnings. *See generally Exhibit B, Starkey Complaint.*

## V.    The Policy

27.    Liberty incorporates by reference the allegations of the preceding paragraphs as though plead here.

28.    The Policy is subscribed 100% by Certain Underwriters at Lloyd's, London listed on the schedule of underwriters.  Liberty subscribed to a twenty-five percent (25%) risk under the Policy.  As noted above, liability under the Policy is several, and not joint, between the individual Lloyd's subscribers.

29.    Underwriters at Lloyd's, London issued the Policy to the National Organization and provides insurance to it in the amount of $1,000,000 per occurrence for the policy period December 31, 2007 to December 31, 2008 and is subject to a $250,000 deductible.

**COMPLAINT FOR DECLARATORY JUDGMENT**

F:\ACTIVE FILES\LIB-LIBERTY MUTUAL IN LONDON\LIB.126-STARKEY\PLEADINGS\Complaint for Declaratory Judgment.doc

30.     The National Organization is a national fraternal organization organized and existing as an Illinois not-for-profit corporation with a principal place of business in Evanston, Illinois.

31.     Pursuant to the Policy's Named Insured Wording, the National Organization is the "Named Insured", neither the Chapter nor the Chapter Member Defendants are Named Insureds.

32.     The Chapter and Chapter Member Defendants may qualify as an insured if they meet a four part test set forth in the Policy's Who Is Insured Endorsement, which provides:

## WHO IS INSURED

    f.    Each of the following entities or persons are insureds, but (a) only while acting in accordance with the "First Named Insured's" policies and procedures, and (b) only while acting in their official capacity, and (c) only while acting within the scope of their duties, and (d) only with respect to their liability for activities performed by them on behalf of the "Named Insureds", or of insured "Chapters", "Colonies", "Housing Organizations", or "Alumni Organizations":

        (1)    "Chapters" and "Colonies"

        (2)    "Undergraduate Insureds"

## FRATERNITY/SORORITY ADDITIONAL DEFINITIONS

IT IS AGREED THAT THE GENERAL LIABILITY COVERAGE FORM JRF-FSL-062, SECTION V – DEFINITIONS IS HEREBY AMENDED BY THE ADDITION OF THE FOLLOWING DEFINITIONS:

"CHAPTERS" AND/OR "COLONIES" MEANS: THOSE COLLEGIATE UNDERGRADUATE ORGANIZATIONS THAT ARE ORGANIZED, CHARTERED, OR RECOGNIZED BY AND WHOSE AFFILIATION WITH THE "NAMED

**COMPLAINT FOR DECLARATORY JUDGMENT**

INSURED" IS ACKNOWLEDGED TO EXIST BY THE GOVERNING BODY OF THE FIRST NAMED INSURED AT THE TIME OF THE LOSS.

"UNDERGRADUATE INSUREDS" MEANS: INDIVIDUALS WHO ARE UNDERGRADUATE COLLEGIATE STUDENTS THAT ARE OFFICERS, MEMBERS, OR MEMBER CANDIDATES, THAT ARE AFFILIATED WITH A "CHAPTER" OR "COLONY" WHOSE AFFILIATION WITH THE "NAMED INSUREDS" IS ACKNOWLEDGED TO EXIST BY THE GOVERNING BODY OF THE FIRST NAMED INSURED AT THE TIME OF THE LOSS.

*Exhibit A, Policy, Endorsement JRF-FSL-064 (adding to Policy, § II);*
*Fraternity/Sorority Additional Definitions, Endorsement JRF-FSL-063.*

33.    Furthermore, the Policy also excludes coverage as follows:

### SPECIAL ENDORSEMENT # E

### SPECIAL ADDITIONAL EXCLUSION

### VIOLATIONS OF FRATERNITY ALCOHOL POLICY

IT IS AGREED THAT THIS SPECIAL EXCLUSION APPLIES TO ALL GENERAL LIABILITY COVERAGE AFFORDED BY THIS POLICY AND THIS EXCLUSION APPLIES TO AND SUPERSEDES ALL OTHER POLICY TERMS AND CONDITIONS:

**I.    SPECIAL ADDITIONAL EXCLUSION – "VIOLATIONS OF FRATERNITY ALCOHOL POLICY"**

No insurance coverage afforded by this policy shall apply to any "Chapter", "Colony" or "Undergraduate Insureds" for any claim arising out of, in any way related to, or in any way resulting from any "Violation" of "Fraternity Alcohol Policy".

/////
/////
/////
/////

8

**COMPLAINT FOR DECLARATORY JUDGMENT**

## II.    ADDITIONAL DEFINITIONS

"Fraternity Alcohol Policy" means: The written rules, regulations, or procedures regarding alcohol, which are established by the First Named Insured or the "Chapter" or "Colony" at the time of the loss.

"Violation" means: Determination by the executive board of the First Named Insured, or legal authority that some breaking, infraction, or breach of "Fraternity Alcohol Policy" occurred.

*Exhibit A, Policy, Endorsement # E, JRF-FSL-080.*

34.    The Policy also extends no coverage for hazing pursuant to Special Endorsement B and as follows:

## LIMITED HAZING COVERAGE

It is agreed that General Liability Coverage Form JRF-FSL-062, Section V. Definitions, 3. "Bodily Injury" and 9. "Occurrence", and other terms and conditions are hereby amended as follows:

### I.    HAZING LIABILITY COVERAGE

The definitions of "Bodily Injury" & "Occurrence" included in Form JRF-FSL-062 are extended to include the term "hazing", and this policy is agreed to afford limited "Hazing" coverage.

### II.    SPECIAL ADDITIONAL HAZING EXCLUSION

This coverage does not apply to any insured that directs others to participate, and/or participates in hazing.

### III.    ADDITIONAL DEFINITION

As used in this policy "Hazing" means without limitation:

Any act or situation created by any insured, with or without the consent of another party, including punishment, harassment,

disturbance, embarrassment, intimidation, ill-treatment, discomfort, personal abuse, persistent torment, criticism, or ridicule, of a physical or mental nature, which is imposed upon any person via the execution upon them, their subjection to, or the extraction from them of any unnecessary, needless, unpleasant, disagreeable, difficult, absurd, abusive, offensive, or ridiculous, tricks or tasks, including those of a foolish, deceptive, or fraudulent nature.

Exhibit A, Policy, Endorsement # B, JRF-FSL-077.

35.     The Starkey Complaint accuses the Chapter and the Chapter Member Defendants of serving alcoholic beverages to Starkey, a minor; failing to supervise consumption of alcohol by minors, including Starkey, and failing to care for Starkey after he became visibly intoxicated and unresponsive, ultimately causing Starkey's death. *Exhibit B, Starkey Complaint at* ¶¶ 36-52 and Counts I through V.

36.     The Starkey Complaint also alleges the Chapter's "Big Brother Event" constituted hazing and resulted in criminal charges against certain Chapter Member Defendants. *Id. at* ¶¶ 36-52 and Count II (violation of Penal Code Section 245.6 ("Matt's Law")).

37.     The National Organization's risk management policies in effect at the time of the "Brown Bag Night" strictly prohibited causing or contributing to the intoxication of a person, furnishing alcohol to a minor, hazing, and the use of alcohol during pledge events.

**COMPLAINT FOR DECLARATORY JUDGMENT**

38.    On the basis of the foregoing, the Policy does not cover the claims against the Chapter and Chapter Member Defendants in the Underlying Action.

39.    In the alternative, the Policy's insuring agreement provides as follows:

    1.    **Insuring Agreement**

        a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We may at our discretion investigate any "occurrence" and settle any claim or suit that may result.  But:

                * * *

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for . . .

    *Policy §1(A)(1).*

    **4.    Excess Insurance**

    This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis including but not limited to the following types of insurance:

            (3) Homeowners, Automobile or any other insurance of "Chapters", "Colonies" or "Undergraduate Insureds";

*Exhibit A, Policy, Form JRF-FSL-062, § IV (4), p. 10 of 15.*

40.    Pursuant to these terms, the Policy includes no duty to defend the Chapter and Chapter Member Defendants even for claims that may be covered. Moreover, any indemnity coverage that may exist is excess of any other insurance the Chapter and Chapter Member Defendants may have.

**COMPLAINT FOR DECLARATORY JUDGMENT**

41.    The Chapter and Chapter Member Defendants each have other

insurance that are or should be defending them in the Underlying Action.  Such

insurance has not been exhausted in a manner triggering Liberty's obligations to

the Chapter or Chapter Member Defendants.

42.    As such, even if coverage existed, Liberty's obligations under the

Policy to the Chapter and the Chapter Member Defendants has not been triggered.

## **Claim For Relief**

WHEREFORE, Liberty seeks a Declaratory Judgment pursuant to the

Federal Declaratory Judgment Statute, 28 U.S.C. § 2201 et seq. and F.R.C.P. 57

on the following claims:

A.    That the Chapter and Chapter Member Defendants are not

"Insureds" under the Policy and, therefore, are not entitled to a

defense or indemnity under the Policy with regard to the

Starkey Complaint.

B.    All coverage is excluded to pursuant to the Exclusion for

Violations of Fraternity Alcohol Policy.

C.    All coverage is excluded to those who participated in or

directed others to participate in Hazing.

D.    That, in the alternative, and should the Court conclude that the

Chapter or Chapter Member Defendants have coverage, or that

**COMPLAINT FOR DECLARATORY JUDGMENT**
F:\ACTIVE FILES\LIB-LIBERTY MUTUAL IN LONDON\LIB.126-STARKEY\PLEADINGS\Complaint for Declaratory Judgment.doc

coverage cannot be determined until further proceedings occur in the Starkey lawsuit, the Policy includes no duty to defend and all coverage available to the Chapter and Chapter Member Defendants is on an indemnity basis and excess of any other insurance coverage available to the Chapter and Chapter Member Defendants.

E.     Award Liberty such other relief, at law or in equity, to which Liberty may be entitled.

Dated: March 23, 2011

Respectfully submitted,

P.K. SCHRIEFFER LLP

By:  _____
Paul K. Schrieffer
Rena M. Stone
Attorney for Plaintiff
Liberty Corporate Capital, Ltd.

---

**COMPLAINT FOR DECLARATORY JUDGMENT**
F:\ACTIVE FILES\LIB-LIBERTY MUTUAL IN LONDON\LIB.126-STARKEY\PLEADINGS\Complaint for Declaratory Judgment.doc

Exhibit "A"

# CERTIFICATE OF INSURANCE
# GENERAL DECLARATIONS
# FRATERNITY / SORORITY INSURANCE PROGRAM

These general declarations, coverage part declarations, schedules, policy forms, and endorsements complete this CERTIFICATE OF INSURANCE. This Certificate is subject to change by endorsement and cancellation or non-renewal in accordance with its terms. **The Assured is requested to read this Certificate and, if it is incorrect, return it immediately for correction.**

**AUTHORITY REFERENCE NUMBER:** 07JFR333

### SCHEDULE OF COVERAGES

In return for payment of the premium, and subject to all the terms of this Certificate, insurance is provided for the coverages designated by ☒ below.

### COVERAGE

☐ Property                  ☒ General Liability

### CERTIFICATE NUMBER

CERTIFICATE NUMBER: 07JFR333-27-L

### NAMED INSURED

ASSURED: **SIGMA ALPHA EPSILON FRATERNITY**

ADDRESS: **1856 SHERIDAN ROAD, EVANSTON, ILLINOIS 60201**

### CERTIFICATE PERIOD

POLICY PERIOD: **DECEMBER 31, 2007 TO DECEMBER 31, 2008**

**AT 12:01 A.M. LOCAL STANDARD TIME**

### CERTIFICATE PREMIUM

PREMIUM: **U.S. $ 306,544.00**

THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT

### INSURANCE EFFECTED WITH

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON          (SEE SCHEDULE)

**Page 1 of 4 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FS-001(A)


EXHIBIT A, Pg 1

# CERTIFICATE OF INSURANCE
# GENERAL DECLARATIONS CONTINUED

## CERTIFICATE FILING INFORMATION

| | | |
|---|---|---|
| PREMIUM: | U.S. $ | 306,544.00 |
| POLICY FEE: | U.S. $ | 250.00 |
| FILING FEES: | U.S. $ | 250.00 |
| SURPLUS LINES TAX: | U.S. $ | 10,729.04 |
| STAMPING FEE: | U.S. $ | 306.54 |

**Page 2 of 4 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FS-001(A)

EXHIBIT A, Pg. 2

**Special Conditions**

**SIGNATURE REQUIRED** - This Certificate shall not be valid unless signed by the correspondent below.

**CORRESPONDENT NOT INSURER** - The Correspondent is not an insurer hereunder and neither is nor shall be liable for any loss or claim whatsoever. The insurers hereunder are those individual Underwriters at Lloyd's, London whose names can be ascertained as set forth below.

**ASSIGNMENT** - This Certificate shall not be assigned either in whole or in part without the written consent of the Underwriters endorsed hereon.

**ATTACHED CONDITIONS INCORPORATED** - This Certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached, or endorsed, all of which are to be considered as incorporated herein.

AND AS PER AGREED WORDING ATTACHED HERETO.

Wherever the words "we", "us", "our" or "Company" appear in the wording attached hereto they shall be deemed to read "Underwriters".

Wherever the words "Master Policy" or "Policy" appear in the wording attached hereto they shall be deemed to read "Certificate".

**This Certificate** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose definitive numbers and the proportions underwritten by them are as shown below (hereinafter referred to as "the Underwriters") and in consideration of the premium specified herein, Underwriters do hereby bind themselves each for his own part, and not for another, their heirs, executors and administrators.

**Page 3 of 4 Pages**

## THE UNDERWRITERS -

| AMOUNT, PERCENTAGE OR PROPORTION | SYNDICATE | UNDERWRITER'S REFERENCE |
|---|---|---|
| PERCENT | | |
| 25.000 | LIB | 4472 |
| 17.730 | NVA | 2007 |
| 17.730 | AGM | 2488 |
| 17.730 | KLN | 0510 |
| 10.910 | GSC | 0958 |
| 10.900 | BRT | 2987 |
| **TOTAL LINE** | **NO. OF SYND.** | |
| 100.000 | 6 | |

## SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.
LSW 1001 (Insurance)

Dated:  1/18/08

(Correspondent)
JAMES R. FAVOR & COMPANY

by: _____
James R. Favor, President

**Page 4 of 4 Pages**

AGREED 6/1/04
Copyright © 2004 James R. Favor

JRF-FS-001(A)

EXHIBIT A Pg. 4

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

| NAMED INSURED | POLICY NUMBER |
|---|---|
| SIGMA ALPHA EPSILON FRATERNITY | 07JFR333-27-L |

### FORMS APPLICABLE TO THIS POLICY

| | |
|---|---|
| JRF-FS-001 (A) | LLOYD'S CERTIFICATE GENERAL DECLARATIONS |
| JRF-FSL-051 | FORMS APPLICABLE TO THIS COVERAGE PART |
| JRF-FSL-052 | SERVICE OF SUIT CLAUSE |
| JRF-FSL-053 | LLOYD'S PRIVACY POLICY STATEMENT |
| JRF-FSL-054 | NAMED INSURED |
| JRF-FSL-055 | SCHEDULE OF INSURED EXPOSURES |
| JRF-FSL-056 | COMMON POLICY CONDITIONS |
| JRF-FSL-057 | ANNUAL REPORTING & ADJUSTMENTS |
| JRF-FSL-058 | LOSS CONTROL BONUS CLAUSE |
| JRF-FSL-059 | LIMITS OF INSURANCE DECLARATIONS |
| JRF-FSL-060 | AMENDMENT – AGGREGATE LIMITS OF INSURANCE (PER LOCATION) |
| JRF-FSL-061 | DEDUCTIBLE ENDORSEMENT |
| JRF-FSL-062 | GENERAL LIABILITY COVERAGE FORM |
| JRF-FSL-063 | FRATERNITY / SORORITY ADDITIONAL DEFINITIONS |
| JRF-FSL-064 | WHO IS INSURED ENDORSEMENT |
| JRF-FSL-065 | ADDITIONAL INSURED |
| JRF-FSL-066 | EMPLOYERS OVERHEAD LIABILITY |
| JRF-FSL-067 | EMPLOYEE BENEFITS LIABILITY – (CLAIMS MADE COVERAGE) |
| JRF-FSL-068 | EMPLOYEE BENEFITS LIABILITY – EXTENDED REPORTING PERIOD |
| JRF-FSL-069 | LIMITED EMPLOYMENT PRACTICES LIABILITY (CLAIMS MADE) |
| JRF-FSL-070 | HIRED AND NONOWNED AUTOMOBILE LIABILITY |
| JRF-FSL-071 | NUCLEAR ENERGY EXCLUSION ENDORSEMENT (BROAD FORM) |
| JRF-FSL-072 | ABSOLUTE MICROORGANISM EXCLUSION |
| JRF-FSL-073 | BIOLOGICAL OR CHEMICAL MATERIALS EXCLUSION |
| JRF-FSL-074 | TOTAL ASBESTOS EXCLUSION |
| JRF-FS-002A | U.S. T.R.I.A. 2002 AS AMENDED NOT PURCHASED CLAUSE |
| JRF-FSL-075 | WAR & TERRORISM EXCLUSION |

**Page 1 of 2 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-051



# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

| NAMED INSURED | POLICY NUMBER |
|---|---|
| SIGMA ALPHA EPSILON FRATERNITY | 07JFR333-27-L |

| FORMS APPLICABLE TO THIS POLICY |
|---|

| | | |
|---|---|---|
| JRF-FSL-076 | ENDORSEMENT #A. | SPECIAL COVERAGE EXTENSION |
| | | PRIMARY COVERAGE FOR "PRIMARY INSUREDS" |
| JRF-FSL-077 | ENDORSEMENT #B. | LIMITED HAZING COVERAGE |
| JRF-FSL-078 | ENDORSEMENT #C. | LIMITED SEXUAL ABUSE OR MISCONDUCT COVERAGE |
| JRF-FSL-079 | ENDORSEMENT #D. | SPECIAL ADDITIONAL EXCLUSION |
| | | ASSAULT AND / OR BATTERY |
| JRF-FSL-080 | ENDORSEMENT #E. | SPECIAL ADDITIONAL EXCLUSION |
| | | VIOLATIONS OF FRATERNITY ALCOHOL POLICY |
| JRF-FSL-081 | ENDORSEMENT #F. | PUNITIVE DAMAGES |

**Page 2 of 2 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-051

EXHIBIT A, Pg. 6

## SERVICE OF SUIT CLAUSE (U.S.A.)

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon Lord, Bissell & Brook, 115 South LaSalle Street, Chicago, Illinois 60603, U.S.A. and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of the Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which make provision therefore, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**Page 1 of 1 Pages**

NMA 1998 (2/24/86)
AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-052


EXHIBIT A, Pg. 7

# LLOYD'S PRIVACY POLICY STATEMENT

## UNDERWRITERS AT LLOYD'S, LONDON

We, the Certain Underwriters at Lloyd's, London that have underwritten this insurance want you to understand how we protect the confidentiality of non-public personal information we collect about you.

## INFORMATION WE COLLECT

We collect non-public personal information about you from the following sources:

(a) Information we receive from you on applications or other forms;

(b) Information about your transactions with our affiliates, others or us; and

(c) Information we receive from a consumer-reporting agency.

## INFORMATION WE DISCLOSE

We do not disclose any non-public personal information about you to anyone except as is necessary in order to provide our products or services to you or otherwise as we are required or permitted by law (e.g., a subpoena, fraud investigation, regulatory reporting, etc.).

## CONFIDENTIALITY AND SECURITY

We restrict access to non-public personal information about you to our employees, our affiliates' employees or others who need to know that information to service your account. We maintain physical, electronic, and procedural safeguards to protect your non-public personal information.

## RIGHT TO ACCESS OR CORRECT YOUR PERSONAL INFORMATION

You have a right to request access to or correction of your personal information in our possession.

## CONTACTING US

If you have any questions about this privacy statement or would like to learn more about how we protect your privacy, please contact the agent/broker who handled this insurance. A more detailed statement of our information privacy is available upon request.

**Page 1 of 1 Pages**

LSW1135A (08/02)
AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-053

EXHIBIT A, Pg. 8

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## SIGMA ALPHA EPSILON FRATERNITY

## NAMED INSURED WORDING

## EFFECTIVE 12/31/07

**THE FIRST NAMED INSURED IS:**

SIGMA ALPHA EPSILON FRATERNITY, INC., an Illinois Not For Profit corporation,

**THE NAMED INSURED ALSO INCLUDES:**

THE SIGMA ALPHA EPSILON FOUNDATION, INC., an Illinois Not For Profit corporation,

SAE FINANCIAL AND HOUSING CORPORATION, an Ohio Not For Profit corporation,

SAE PROPERTIES HOLDING, INC., an Ohio Not For Profit corporation,

SAE AFFINITY, INC., an Ohio Not For Profit corporation,

SIGMA ALPHA EPSILON RETIREMENT PLAN,

SIGMA ALPHA EPSILON 401K PLAN,


All other terms and conditions remain unchanged.


12/31/07 JRF/FG


**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-054


EXHIBIT A Pg.9

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SCHEDULE OF INSURED EXPOSURES

Except with respect to the interest of the "Named Insureds", no insurance coverage is afforded, with respect to any exposures that are not shown in the schedule below:

## LIABILITY COVERAGE SCHEDULE:

### PER SCHEDULE OF EXPOSURES ON FILE WITH US

This policy excludes all exposures or any claims arising in the state of Texas.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-055

EXHIBIT A , Pg.10

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

## COMMON POLICY CONDITIONS

**CONDITIONS:**

The following conditions are included in this policy, unless otherwise stated.

### A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy or any coverage part by mailing or delivering to us advance written notice of cancellation.

2. If this policy has been in effect for less than 60 days, we may cancel this policy or any coverage by mailing or delivering to the First Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or if there is the occurrence of incendiarism on the part of any insured.

   b. 30 days before the effective date of cancellation if we cancel for failure to meet underwriting standards and/or failure to respond to or implement loss control requirements on the part of any insured.

   c. 90 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the First Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation, which ends the coverage. The policy period will end on that date.

5. If this policy or any coverage part is cancelled, we will send the First Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient and conclusive proof of notice and receipt.

7. Cancellation of Policies in Effect for 60 Days or More:

   a. If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel this policy or any coverage by mailing through first class mail to the First Named Insured written notice of cancellation.

      (1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or if there is the occurrence of incendiarism on the part of any insured.

      (2) 30 days before the effective date of cancellation if we cancel for failure to meet underwriting standards and/or failure to respond to or implement loss control requirements on the part of any insured.

      (3) 90 days before the effective date of cancellation if we cancel for any other reason.

   b. We may cancel this policy based on one or more of the following:

      (1) Non-Payment of premium;

      (2) As permitted by state statute;

      (3) A false statement knowingly made by the insured or failure to disclose a material fact on the application for procurement or renewal of this insurance; or

      (4) A fraudulent claim; or

      (5) A substantial change in the exposure or risk other than that indicated in the original or renewal application for this insurance and underwritten as of the effective date of the policy unless the insured has notified us of the change and we accept such change.

**Page 1 of 3 Pages**

AGREED 6/1/04
Copyright © 2004 James R. Favor

JRF-FSL-056

EXHIBIT A, Pg. 11

**B. NONRENEWAL**

If we decide not to renew this policy, we will mail through first-class mail or send via fax or e-mail to the first Named Insured shown in the Declarations written notice of the non renewal at least 90 days before the expiration or renewal date.

If notice is mailed, proof of mailing will be sufficient and conclusive proof of notice and receipt.

**C. INCREASE IN PREMIUM OR DECREASE IN COVERAGE**

We will not increase the premium unilaterally or decrease the coverage benefits on renewal of this policy unless we mail through first-class mail or send via fax or e-mail written notice of our intention, including the actual reason, to the first Named Insured's last mailing address known to us, at least 90 days before the effective date.

Any decrease in coverage during the policy term must be based on one or more of the following reasons:

1. Nonpayment of premium;

2. A false statement knowingly made by the insured on the application for insurance; or

3. A substantial change in the exposure or risk other than that indicated in the original or renewal application for this insurance and underwritten as of the effective date of the policy unless the insured has notified us of the change and we accept such change.

If notice is mailed, proof of mailing will be sufficient and conclusive proof of notice and receipt.

**D. CHANGES**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived in accordance with information on file with us or by endorsement issued by us and made a part of this policy.

**E. COMPLIANCE BY INSUREDS**

We have not duty to provide coverage under this policy unless you and any other involved insured have fully complied with all the terms and conditions of this policy.

**F. CONFORMANCE WITH STATE LAWS**

Any terms of this insurance that are in conflict with the applicable statutes of the State in which this policy is effective are amended to conform to such statutes.

**G. FIRST NAMED INSURED**

The person or organization first named in the Declarations. The First Named Insured is responsible for payment of all premiums and will act on behalf of all insureds for the giving and receiving of notice of cancellation or nonrenewal and the receiving of any return premium that becomes payable under this policy.

**H. AUDIT OF BOOKS AND RECORDS**

We may examine and audit your books and records as they relate to this insurance at any time during the term of this policy and up to three years thereafter.

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-056

EXHIBIT A, Pg. 12

**I.   INSPECTIONS AND SURVEYS**

We have the right but are not obligated to:

Make inspections and surveys at any time;

Give you reports on the conditions we find; and

Recommend or require changes.

Any inspections, surveys, reports, recommendations, or requirements relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1.   Are safe or healthful; or

2.   Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service, inspection or similar organization that makes insurance inspections, surveys, loss control reports or recommendations.

**J.   TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY**

Your rights and duties under this policy may not be transferred without our written consent.

However, if you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative, or to anyone having proper temporary custody of your property until your legal representative has been appointed.

**K.   UNINTENTIONAL ERRORS OR OMISSIONS**

The coverage afforded by this policy shall not be prejudiced, invalidated, or adversely effected by any errors, omissions, improper descriptions or failure to disclose all hazards existing as of the inception date of the policy provided that such errors, omissions, improper descriptions, or failure to disclose all hazards is not intentional.

**L.   KNOWLEDGE OF OCCURRENCE**

It is hereby understood and agreed, that knowledge of an occurrence by a member, servant, or employee of the insured, shall not in itself constitute knowledge by the insured, unless an executive officer of the First Named Insured, its executive director, or its national headquarters, shall have received such notice from the member, servant, or employee.

**M. NOTICE OF OCCURRENCE**

When the insured reports the occurrence of any accident to the insurance carrier insuring their worker's compensation insurance, which later develops into a liability claim, coverage for which is provided by the policy to which this endorsement is attached, failure to report such accident at the time of the occurrence shall not be deemed in violation of the general conditions above referenced upon understanding and agreement, however, that the insured shall as soon as they are definitely made aware of the fact that the particular accident is a liability case rather than a worker's compensation case, give notice of the aforesaid accident to underwriters.

**Page 3 of 3 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-056

EXHIBIT A, Pg. 13

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ANNUAL REPORTING & ADJUSTMENTS ENDORSEMENT

**PER SCHEDULE OF EXPOSURES AGREED BY UNDERWRITERS AND
KEPT ON FILE WITH US.**

Coverage under this policy may be provided for one or more locations. Additions, deletions, and adjustments in this policy may be accomplished via an annual reporting of such adjustments under such format and subject to such premium in arrears as are agreed by underwriters.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-057

EXHIBIT A, Pg. 14

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LOSS CONTROL BONUS CLAUSE

**The premiums and losses of both the Insured's Property and Liability Coverages will be combined to determine the Loss Control Bonus.**

It is understood and agreed that 18 Months after the expiry of this Policy Underwriters hereon agree to return to the Named Insured an Interim Loss Control Bonus calculated as follows:

Gross Loss Ratio between 60% - 50% return 10% of Underwriters Net Profit
Gross Loss Ratio between 50% - 40% return 15% of Underwriters Net Profit
Gross Loss Ratio between  0% - 40% return 20% of Underwriters Net Profit

**Underwriters will only pay a Loss Control Bonus if the Insured has renewed or agreed to renew Coverage with James R. Favor and Underwriters for two subsequent years.**

It is further understood and agreed that 36 Months after the expiry of this Policy a further and provisional Final Adjustment to the above Loss Control Bonus shall be made.

The final adjustment calculation shall be made only after all liability has ceased and all claims files have been closed or a full release of all liabilities hereunder is provided to Underwriters signed and dated by the First Named Insured's Chairman, President or Executive Director.

Should the final result be a loss to Underwriters, such Net Loss shall be carried forward as a deficit to the following years for inclusion in the Loss Control Bonus Calculation, subject however to such deficit being carried forward no longer than 3 (Three) years in all.

All other terms and conditions remain unchanged.

**Page 1 of 2 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-058


EXHIBIT A, Pg. 15

# LOSS CONTROL BONUS FORMULA / DEFINITIONS

## LOSS CONTROL BONUS FORMULA / TABLE

| INSUREDS GROSS LOSS RATIO | PERCENTAGE OF U/W PROFIT DUE INSURED |
|---|---|
| 50% - 60% | 10.00% |
| 40% - 50% | 15.00% |
| 00% - 40% | 20.00% |

**DEFINITIONS:**

**GROSS LOSS RATIO =**
1) POLICY PERIOD LOSSES % POLICY PERIOD EARNED PREMIUMS

**POLICY PERIOD LOSSES = THE SUM OF THE FOLLOWING**
1) CLAIM RESERVES – TO BE SIGNED OFF BY THIRD PARTY ADMINISTRATOR
2) CLAIM PAYMENTS
3) CLAIM EXPENSES
    (EXCLUDING EXPENSES FOR U/W THIRD PARTY ADMINISTRATOR)
    (EXCLUDING EXPENSES FOR U/W INTERESTS)

**POLICY PERIOD EARNED PREMIUMS =**
1) GROSS EARNED PREMIUMS FOR THE POLICY PERIOD

**UNDERWRITERS NET PROFIT =**
1) UNDERWRITERS NET EARNED PREMIUM – INCURRED LOSSES

**UNDERWRITERS NET EARNED PREMIUM =**
1) POLICY PERIOD EARNED PREMIUM x 75%

**INCURRED LOSSES = THE SUM OF THE FOLLOWING**
1) CLAIM RESERVES – TO BE SIGNED OFF BY THIRD PARTY ADMINISTRATOR
2) CLAIM PAYMENTS
3) CLAIM EXPENSES
    (EXCLUDING EXPENSES FOR U/W THIRD PARTY ADMINISTRATOR)
    (EXCLUDING EXPENSES FOR U/W INTERESTS)
4) ANY NET U/W LOSSES (DEFICITS)
    (LIMITED TO PRIOR 3 YEARS)

**DEFICIT =**
1) ANY NET U/W LOSS (LIMITED TO PRIOR 3 YEARS)

**Page 2 of 2 Pages**

AGREED 6/1/04
Copyright © 2004 James R. Favor

JRF-FSL-058



EXHIBIT A, Pg. 16

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

## LIMITS OF INSURANCE DECLARATIONS

| NAMED INSURED | POLICY NUMBER |
|---|---|
| **SIGMA ALPHA EPSILON FRATERNITY** | **07JFR333-27-L** |

| LIMITS OF INSURANCE | |
|---|---|
| **COVERAGES** | **LIMITS OF LIABILITY** |
| AGGREGATE LIMITS OF LIABILITY | $ 2,000,000  Products/Completed Operations Aggregate |
| AGGREGATE LIMITS OF LIABILITY | $ 2,000,000  General Aggregate (other than Products/Completed Operations) |
| COVERAGE A - Bodily Injury and Property Damage Liability | $ 1,000,000  any one occurrence subject to the Products/Completed Operations and General Aggregate Limits of Liability |
| Fire Damage Liability | $ 50,000  any one fire subject to the Coverage A occurrence and the General Aggregate Limits of Liability |
| COVERAGE B - Personal and Advertising Injury Liability | $ 1,000,000  any one person or organization subject to the General Aggregate Limit of Liability |
| COVERAGE C - Medical Payments | $ 5,000  any one person subject to the Coverage A occurrence and the General Aggregate Limits of Liability |

**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-059


EXHIBIT A, Pg. 17

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AGGREGATE LIMITS OF INSURANCE
## (PER LOCATION)

The General Aggregate Limit under LIMITS OF INSURANCE (Section III) applies separately to each of your "Locations" owned by or rented to or used by an insured.

"Locations" means:

The single principal place from which the Named Insureds and each "Chapter", "Colony", "Housing Organization" or "Alumni Organization" conduct their operations.

**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-060

EXHIBIT A Pg. 18

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DEDUCTIBLE ENDORSEMENT
## (INCLUDING SUPPLEMENTARY PAYMENTS WITHIN THE DEDUCTIBLE)

**The deductible applies jointly and concurrently to the following policies:**
**1) 07JFR333-27-L and 2) 07JFR333-27-LTX**

The deductible amount shown below applies to all injury or damage under SECTION I – COVERAGES including all payments made under the provisions of SUPPLEMENTARY PAYMENTS – COVERAGES A AND B. The Supplementary Payments include the salaries and other expenses of attorneys assigned by us to defend "suits" against you, but not the salaries of our other employees.

| Amount of Deductible: | | |
|---|---|---|
| | **$ 250,000** | Aggregate |
| | **$ 250,000** | Per Occurrence |

1. Our obligation under SECTION I – COVERAGES for injury or damage including damages and expenses under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B applies only to the difference between the deductible amounts shown above and the limits of insurance stated in the policy. Any payment made which includes such deductible amounts shall not increase our liability with respect to each "occurrence" and aggregate.

2. The deductible applies as follows:

   a. The total deductible amount you pay during the policy period shall not exceed the amount shown above as Aggregate; and

   b. Subject to (a) above, the most you will pay for any one "occurrence" is the deductible amount shown above as Per Occurrence.

3. The terms of this insurance, including those with respect to:

   a. Our right and duty to defend any "suits" seeking damages: and

   b. Your duties in the event of an "occurrence", claim, or "suit";

   apply irrespective of the application of the deductible amount.

4. You will be advised prior to the payment of any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-061

EXHIBIT A, Pg. 19

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

## GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as an "Insured" under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under (SECTION II) WHO IS AN INSURED.

Other words and phrases that appear in quotation marks have special meaning. Refer to (SECTION V) DEFINITIONS.

### SECTION I – COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in (SECTION III) LIMITS OF INSURANCE and;

      (2) Any right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period.

   c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

   This insurance does not apply to:

   a. "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

   b. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

### Page 1 of 15 Pages

AGREED 7/11/06
Copyright © 2004 James R. Favor

JRF-FSL-062


EXHIBIT A Pg. 20

(1) Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

(2) That an insured would have in the absence of the contract or agreement.

c.   Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

d.   "Bodily injury" to:

(1) An employee of the insured arising out of and in the course of employment by the insured; or

(2) The spouse, child, parent, brother or sister of that employee as a consequence of (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

e.   (1)  "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

(i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraphs (a) and (d) (i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

(2)  Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

**Page 2 of 15 Pages**

AGREED 7/11/06
*Copyright © 2004 James R. Favor*

JRF-FSL-062

EXHIBIT A, Pg. 21

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

f.   "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f. (2) or f. (3) of the definition of "mobile equipment" (SECTION V.8).

g.   "Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed or demolition contest or in any stunting activity.

h.   "Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

i.   Property damage" to:

(1) Property you own, rent, or occupy;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of an insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

**Page 3 of 15 Pages**

AGREED 7/11/06
Copyright © 2004 James R. Favor

JRF-FSL-062

EXHIBIT A, Pg. 22

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

j.   "Property damage" to "your product" arising out of it or any part of it.

k.   "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

l.   "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

m. Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions c. through m. do not apply to damage by fire, explosion, smoke, water damage, weight of ice and snow, leakage from fire protection equipment, vehicles, or vandalism to premises rented to you.  A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (SECTION III).

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1.  **Insuring Agreement**

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies.   We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result.  But:

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Any right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

## Page 4 of 15 Pages

EXHIBIT A, Pg. 23

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

b.  This insurance applies to:

(1)  "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2)  "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed in the "coverage territory" during the policy period.

2.  **Exclusions**

This insurance does not apply to:

a.  "Personal injury" or "advertising injury":

(1)  Arising out of oral or written publication of material, if done by or at the direction of an insured with the knowledge of its falsity;

(2)  Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3)  Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of an insured; or

(4)  For which an insured has assumed liability in a contract or agreement.  This exclusion does not apply to liability for damages that an insured would have in the absence of the contract or agreement.

b.  "Advertising injury" arising out of:

(1)  Breach of contract, other than misappropriation of advertising ideas under an implied contract;

(2)  The failure of goods, products or services to conform with advertised quality or performance;

(3)  The wrong description of the price of goods, products or services; or

(4)  An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

**COVERAGE C. MEDICAL PAYMENTS**

1.  **Insuring Agreement**

a.  We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1)  On premises you own or rent;

(2)  On ways next to premises you own or rent; or

(3)  Because of your operations;

provided that:

**Page 5 of 15 Pages**

AGREED 7/11/06
Copyright © 2004 James R. Favor

JRF-FSL-062

EXHIBIT A, Pg.24

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b.  We will make these payments regardless of fault.  These payments will not exceed the applicable limit of insurance.  We will pay reasonable expenses for:

(1) First aid at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2.  Exclusions**

We will not pay expenses for "bodily injury":

a.  To any insured.

b.  To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c.  To a person injured on that part of premises you own or rent that the person normally occupies.

d.  To a person, whether or not an employee of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers compensation or disability benefits law or a similar law.

e.  To a person injured while taking part in athletics.

f.  Included within the "products-completed operations hazard".

g.  Excluded under Coverage A.

h.  Due to war, whether or not declared, or any act or condition incident to war.  War includes civil war, insurrection, rebellion or revolution.

**SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**

We will pay, with respect to any claim or "suit" we defend:

1.  All expenses we incur.

2.  Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies.  We do not have to furnish these bonds.

3.  The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance.  We do not have to furnish these bonds.

4.  All reasonable expenses incurred by an insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $100 a day because of time off from work.

5.  All costs taxed against an insured in the "suit".

**Page 6 of 15 Pages**

AGREED 7/11/06
Copyright © 2004 James R. Favor

JRF-FSL-062



6. Pre-judgment interest awarded against an insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer.

7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

   a. Your employees, other than your executive officers, but only for acts within the scope of their employment by you. However, no employee is an insured for:

      (1) "Bodily injury" or "personal injury" to you; or

      (2) "Bodily injury" or "personal injury" arising out of his or her providing or failing to provide professional health care services; or

      (3) "Property damage" to property owned or occupied by or rented or loaned to that employee, any of your other employees, or any of your partners or members (if you are a partnership or joint venture).

   b. Any person (other than your employee), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this insurance.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   a. "Bodily injury" to a co-employee of the person driving the equipment; or

## Page 7 of 15 Pages

AGREED 7/11/06
Copyright © 2004 James R. Favor

JRF-FSL-062

EXHIBIT A, Pg. 26

   b.  "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4.  Any organization you newly acquire or form, and over which you maintain ownership or majority interest, will qualify as an insured if there is no other similar insurance available to that organization. However:

   a.  Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b.  Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c.  Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

## SECTION III – LIMITS OF INSURANCE

1.  The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a.  insureds;

   b.  Claims made or "suits" brought; or

   c.  Persons or organizations making claims or bringing "suits".

2.  The General Aggregate Limit is the most we will pay for the sum of:

   a.  Medical expenses under Coverage C;

   b.  Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c.  Damages under Coverage B.

3.  The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard".

4.  Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

5.  Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a.  Damages under Coverage A; and

   b.  Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6.  Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises rented to you arising out of any insured peril.

7.  Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

## Page 8 of 15 Pages

Copyright © 2004 James R. Favor

JRF-FSL-062

EXHIBIT A, Pg. 27

The limits of this insurance apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of an insured or of an insured's estate will not relieve us of our obligations under this insurance.

2. **Duties in the Event of Occurrence, Claim or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense, which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to an insured because of injury or damage to which this insurance may also apply.

   d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this insurance:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this insurance unless all of its terms have been fully complied with.

AGREED 7/11/06
*Copyright © 2004 James R. Favor*

JRF-FSL-062

EXHIBIT A, Pg 28

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this insurance or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insureds and the claimant or the claimant's legal representative.

**4.  Excess Insurance**

This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis including but not limited to the following types of insurance:

   (1)  Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

   (2)  Fire insurance for premises rented to you; or

   (3)  Homeowners, Automobile or any other insurance of "Chapters", "Colonies" or "Undergraduate Insureds"; or

   (4)  If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

We will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we may undertake to do so, but we will be entitled to the insured's rights against all those other insurers. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

**5.  Premium Audit**

   a.  We will compute all premiums for this insurance in accordance with our rules and rates.

   b.  Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the First Named Insured.

   c.  The First Named Insured must keep records of the information we will need for premium computation, and send us copies at such times as we may request.

**6.  Representations**

By accepting this policy, you agree:

   a.  The statements in the Declarations are accurate and complete;

   b.  Those statements are based upon representations you made to us; and

   c.  We have issued this policy in reliance upon your representations.

**7.  Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this insurance to the First Named Insured, this insurance applies:

   a.  As if each insured were the only insured; and

   b.  Separately to each insured against whom claim is made or "suit" is brought.

**Page 10 of 15 Pages**

AGREED 7/11/06
Copyright © 2004 James R. Favor

JRF-FSL-062

EXHIBIT A, Pg. 29

**8. Transfer of Rights of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us. No insured must do anything after loss to impair them. At our request, an insured will bring "suit" or transfer those rights to us and help us enforce them.

**SECTION V – DEFINITIONS**

1. "Advertising injury" means injury arising out of one or more of the following offenses:

   a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   b. Oral or written publication of material that violates a person's right of privacy;

   c. Misappropriation of advertising ideas or style of doing business; or

   d. Infringement of copyright, title or slogan.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

   c. All parts of the world if:

      (1) The injury of damage arises out of:

         (a) Goods or products made or sold by you in the territory described in a. above; or

         (b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

      (2) With respect to claims or "suits" brought outside of the United States of America (including its territories and possessions), Puerto Rico and Canada:

         (a) You will undertake the investigation, settlement and defense of the claims and "suits" and you will keep us advised or all proceedings and actions.

         (b) Our obligation is limited to reimbursing you for:

            (1) "bodily injury", "property damage", "Personal Injury" or "Advertising Injury" due to liability imposed on any insured by law; and

            (2) all reasonable expenses incurred in connection with the investigation, settlement or defense of the claims or "suits".

**Page 11 of 15 Pages**

AGREED 7/11/06
Copyright © 2004 James R. Favor

JRF-FSL-062


EXHIBIT A, Pg 30

(3) Our obligation under 2.b. above is limited to the amount stated in the policy as the applicable Limit of Insurance. Also, we may, at our discretion, participate in the defense or settlement of any claim or "suit".

5. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement

6. "Insured contract" means:

   a. A lease of premises;

   b. Sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   An "Insured contract" does not include that part of any contract or agreement:

   a. That indemnifies any person or organization for "bodily injury" or "property damage" arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road beds, tunnel, underpass or crossing;

   b. That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (1) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

      (2) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

   c. Under which an insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of an insured's rendering or failing to render professional services, including those listed in b. above and supervisory, inspection or engineering services; or

   d. That indemnifies any person or organization for damage by fire to premises rented or loaned to you.

**Page 12 of 15 Pages**

AGREED 7/11/06
Copyright © 2004 James R. Favor

JRF-FSL-062

EXHIBIT A, Pg. 31

7.  "Loading or unloading" means the handling of property:

   a.  After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b.  While it is in or on an aircraft, watercraft or "auto"; or

   c.  While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

8.  "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a.  Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b.  Vehicles maintained for use solely on or next to premises you own or rent;

   c.  Vehicles that travel on crawler treads;

   d.  Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1)  Power cranes, shovels, loaders, diggers or drills; or

      (2)  Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e.  Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1)  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2)  Cherry pickers and similar devices used to raise and lower workers;

   f.  Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

      (1)  Equipment designed primarily for:

         (a)  Snow removal;

         (b)  Road maintenance, but not construction or resurfacing;

         (c)  Street cleaning;

      (2)  Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

      (3)  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

9.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**Page 13 of 15 Pages**

AGREED 7/11/06
*Copyright © 2004 James R. Favor*

JRF-FSL-062

EXHIBIT A, Pg. 32

10. "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor.

    d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

    e. Oral or written publication of material that violates a person's right of privacy.

11. a. "Products-completed operations hazard" includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or "property damage" occurs after you have relinquished possession of those products.

    b. Your work" will be deemed completed at the earliest of the following times:

        (1) When all of the work called for in the contract has been completed.

        (2) When all of the work to be done at the site has been completed if the contract calls for work at more than one site.

        (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    c. This hazard does not include "bodily injury" or "property damage" arising out of:

        (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

        (2) The existence of tools, uninstalled equipment or abandoned or unused materials;

        (3) Products or operations for which the classification in this insurance or in our manual of rules includes products or completed operations.

12. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it;

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

13. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

    a. An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

<b>Page 14 of 15 Pages</b>

AGREED 7/11/06
*Copyright © 2004 James R. Favor*

JRF-FSL-062


EXHIBIT A, pg 33

b.  Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

14. "Your product" means:

   a.  Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      (1)  You;

      (2)  Others trading under your name; or

      (3)  A person or organization whose business or assets you have acquired; and

   b.  Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   "Your product" includes:

   a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

   b.  The providing of or failure to provide warnings or instructions.

   "Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

15. "Your work" means:

   a.  Work or operations performed by you or on your behalf; and

   b.  Materials, parts or equipment furnished in connection with such work or operations.

   "Your work" includes:

   a.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

   b.  The providing of or failure to provide warnings or instructions.

**Page 15 of 15 Pages**

AGREED 7/11/06
*Copyright © 2004 James R. Favor*

JRF-FSL-062

EXHIBIT A, Pg. 34

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## <u>FRATERNITY / SORORITY ADDITIONAL DEFINITIONS</u>

It is agreed that General Liability Coverage Form JRF-FSL-062, Section V – Definitions is hereby amended by the addition of the following definitions:

"Chapters" and / or "Colonies" means: those collegiate undergraduate organizations that are organized, chartered, or recognized by and whose affiliation with the "Named Insureds" is acknowledged to exist by the governing body of the First Named Insured at the time of loss.

"Undergraduate Insureds" means: individuals who are undergraduate collegiate students that are officers, members, or member candidates, that are affiliated with a "Chapter" or "Colony" whose affiliation with the "Named Insureds" is acknowledged to exist by the governing body of the First Named Insured at the time of loss.

"House Organizations" and / or "Alumni Organizations" means: housing or alumni groups, including but not limited to, House Corporations or Associations, Alumni Corporations, Alumni Associations, Alumni Chapters or Alumni Clubs, or Chapter Educational Foundations, whose affiliation with the "Named Insureds" or a "Chapter" or "Colony" is acknowledged to exist by the governing body of the First Named Insured at the time of loss.

"Directors and Officers" means: individuals other than "Undergraduate Insureds", who are directors and officers including but not limited to, elected or appointed directors, officers, partners or trustees, each board, committee and the members thereof, and any other recognized director or officer positions affiliated with the "Named Insureds", or with any "Housing Organization", or "Alumni Organization" whose affiliation with the "Named Insureds" is acknowledged to exist by the governing body of the First Named Insured at the time of loss.

"Individual Insureds" means: individuals other than "Undergraduate Insureds", including but not limited to, volunteers, advisors, house directors or house mothers, and agents or other personnel of the "Named Insureds" or of a "Chapter", "Colony", "Housing Organization", or "Alumni Organization" whose affiliation with the "Named Insureds" or a "Chapter", "Colony", "Housing Organization", or "Alumni Organization" is acknowledged to exist by the governing body of the First Named Insured at the time of loss.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 8/14/07
*Copyright © 2004 James R. Favor*

JRF-FSL-063


EXHIBIT __A__ Pg 35

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## <u>WHO IS INSURED</u>

GENERAL LIABILITY COVERAGE FORM JRF-FSL-062, SECTION II WHO IS AN INSURED, PARAGRAPH 2. IS AMENDED TO ADD THE FOLLOWING PARAGRAPHS:

e.  The First Named Insured as shown in the Declarations and any other Named Insured shown in an endorsement to this policy.

f.  Each of the following entities or persons are insureds, but (a) only while acting in accordance with the "First Named Insured's" policies and procedures, and (b) only while acting in their official capacity, and (c) only while acting within the scope of their duties, and (d) only with respect to their liability for activities performed by them on behalf of the "Named Insureds", or of insured "Chapters", "Colonies", "Housing Organizations", or "Alumni Organizations":

   (1) "Chapters" and "Colonies"

   (2) "Undergraduate Insureds"

   (3) "Housing Organizations" and "Alumni Organizations"

   (4) "Directors and Officers"

   (5) "Individual Insureds"

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

JRF-FSL-064

AGREED 8/14/07
*Copyright © 2004 James R. Favor*

EXHIBIT A, pg. 36

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

A.  **SCHEDULE OF ADDITIONAL INSUREDS**

   **NAME OF ADDITIONAL INSUREDS / PERSONS OR ORGANIZATIONS**

   **ALL ADDITIONAL INTERESTS AS REQUIRED BY THE INSUREDS.**

B.  **PROVISIONS**

   1. WHO IS AN INSURED (SECTION II) IS AMENDED TO INCLUDE AS AN ADDITIONAL INSURED THE PERSON(S) OR ORGANIZATION(S) SHOWN IN THE SCHEDULE ABOVE, BUT ONLY WITH RESPECT TO ANY BODILY INJURY, PROPERTY DAMAGE, PERSONAL INJURY OR ADVERTISING INJURY ARISING SOLELY OUT OF AN OCCURRENCE OR OFFENSE BY AN INSURED.

   2. THIS INSURANCE DOES NOT APPLY ON ANY BASIS TO BODILY INJURY, PROPERTY DAMAGE, PERSONAL INJURY OR ADVERTISING INJURY ARISING OUT OF AN OCCURRENCE OR OFFENSE BY THE ADDITIONAL INSURED.

   3. THIS INSURANCE IS EXCESS OVER ANY OTHER INSURANCE, INCLUDING ANY SELF-INSURED RETENTION OR DEDUCTIBLE PORTION THEREOF, WHETHER PRIMARY, EXCESS, CONTINGENT OR ON ANY OTHER BASIS, AVAILABLE TO THE ADDITIONAL INSURED UNLESS THE FIRST NAMED INSURED HAS AGREED IN A WRITTEN AGREEMENT FOR THIS INSURANCE TO APPLY OTHERWISE.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 8/17/07
*Copyright © 2004 James R. Favor*

JRF-FSL-065

EXHIBIT A, Pg. 37

# FRATERNITY / SORORITY INSURANCE PROGRAM GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EMPLOYERS OVERHEAD LIABILITY

1.  SECTION I – COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

    Insuring Agreement is amended by adding the following:

    This insurance applies to damages because of "bodily injury" by accident or disease to your employee who is employed in any state listed below, arising out of and in the course of the employee's work.  The employee's operations must be in the state listed below, or necessary or incidental to such operations.  This insurance applies only with respect to:

    a.  Any obligation to repay a person who is not your employee for damages that person paid for the employee's "bodily injury";

    b.  "Bodily injury" for which no benefits are payable under the "Workers Compensation Laws" of any listed state;

    c.  "Bodily injury" which involves occupations for which no coverage is afforded by the "Workers Compensation Laws" of any listed state; or

    d.  "Bodily injury" for which benefits may be payable under the "Workers Compensation Laws" of any listed state, if in addition to those benefits you become legally liable to pay further damages for which you have no immunity under the "Workers Compensation Laws" of that listed state, but only to the extent of such further damages.

2.  With respect to the "bodily injury" coverage in 1. above, Exclusions c. and d. of SECTION I – COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY are replaced by the following:

    a.  "Bodily injury" to any employee, if with respect to the employee, you:

        (1) have failed to comply with the "Workers Compensation Laws" of any listed state;

        (2) have failed to buy or maintain insurance in the Workers Compensation Fund of any listed state; or

        (3) are in default in the payment of premium or furnishing information to the administration of that fund.

    b.  "Bodily injury", if benefits for that "bodily injury" are payable under the U.S. Longshoremen's & Harbor Workers' Compensation Act or the Federal Coal Mine Health and Safety Act.

    c.  Any obligation for which you or another insurance company as your insurer may be held liable under any:

        (1) "Workers Compensation Laws";

        (2) Disability Benefits or Unemployment Compensation Law; or

        (3) Any similar law.

3.  With respect to this endorsement only, the Limit(s) of Insurance:

    a.  Shown in the Declarations do not apply;

    b.  Shown below as Bodily Injury by Accident – each accident is the most we will pay for all damages because of "bodily injury" to one or more employees in any one accident.  A disease is not "bodily injury" by accident unless it results directly from "bodily injury" by accident;

**Page 1 of 2 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-066

EXHIBIT A, Pg. 38

c. Shown below as Bodily Injury by Disease – aggregate is the most we will pay for all damages because of "bodily injury" by disease, regardless of the number of persons who sustain "bodily injury" by disease;

d. Shown below as Bodily Injury by Disease – each employee is the most we will pay for all damages because of "bodily injury" by disease to any one employee, subject to 3.c. above.

Under parts c. and d. above, "bodily injury" by disease does not include disease that results directly from "bodily injury" by accident.

4. With respect to this endorsement only, the DEFINITIONS Section is amended by the following:

a. Part 4.c. does not apply.

b. The following definition is added:

"Workers Compensation Laws" means the workers or workmen's compensation law and occupational disease law of each state or territory. It includes any amendments to that law which are in effect during the policy period. It does not include the provisions of any law that provide non-occupational disability benefits.

## SCHEDULE

LIST OF STATES:

**U.S.A.**

LIMITS OF INSURANCE:

| BODILY INJURY BY ACCIDENT | **$1,000,000** | EACH ACCIDENT |
| BODILY INJURY BY DISEASE | **$2,000,000** | AGGREGATE |
| BODILY INJURY BY DISEASE | **$1,000,000** | EACH EMPLOYEE |

All other terms and conditions remain unchanged.

**Page 2 of 2 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-066

EXHIBIT A, pg 39

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EMPLOYEE BENEFITS LIABILITY – (Claims Made Coverage)

This endorsement provides additional coverage for Employee Benefits Liability as follows:

With respect to the additional coverage provided by the endorsement only, certain provisions of the General Liability Coverage Form JRF-FSL-062 are amended and replaced as set forth below. The limits of Insurance for this additional coverage are shown in the schedule below.

## SCHEDULE

LIMITS OF INSURANCE:

Aggregate Limit          **$2,000,000**

Each Employee Limit      **$1,000,000**

A $1000 deductible applies to each claim.

This insurance does not apply to damages because of acts, errors or omissions, which occurred before the Retroactive date, shown below.

Retroactive date:    **NONE**

### 1.  INSURING AGREEMENT

We will pay those sums the insured becomes legally obligated to pay as damages due to any negligent act, error or omission by you or any person for whose acts you are legally responsible in the "management" of "public employee benefits" or "private employee benefits". This insurance does not apply to damages because of acts, errors or omission, which occurred before the Retroactive date or after the endorsement period.

We will have the right and duty to defend any "suit" seeking such damages; but:

a.  The amount we will pay for damages is limited as described in Section 4. LIMITS OF INSURANCE;

b.  We may at our discretion, investigate any act, error or omission and settle any claim or "suit" that may result;

c.  Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements.

This insurance applies only if a claim for damages because of a negligent act, error or omission in the "management" of "public employee benefits" or "private employee benefits" is first made against any insured during the endorsement period by:

a.  Your employee;

b.  your former employee; or

c.  the beneficiaries or legal representatives of your employee or your former employee.

A claim by a person or organization will be deemed to have been made when notice of such claim is received and recorded by any insured or by us, whichever is first.

### Page 1 of 5 Pages

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-067

EXHIBIT A, Pg. 40

All claims for damages by the same person and due to the same or related negligent act, error or omission will be deemed to have been made at the time the first of those claims is made against any insured.

Written notice given by the insured during the endorsement period of an act, error or omission taking place during the endorsement period which may result in a claim will be considered a claim made against the insured during the endorsement period.

2.  **EXCLUSIONS**

This insurance does not apply:

a.  If as of the effective date of this endorsement the insured had knowledge or could reasonably foresee any circumstances, which might result in the claim.

b.  To fines, penalties or taxes.

c.  To damages for acts, errors or omissions, which occurred before the Retroactive date, shown in the Schedule.

d.  To any claim for damages because of:

    (1) Dishonest, fraudulent, criminal, or malicious acts or omissions.

    (2) Libel or slander.

    (3) Discrimination or humiliation.

    (4) The willful or reckless violation of any statute.

    (5) Loss of money, bank notes, bullion, checks, money orders, and all other negotiable and non-negotiable instruments representing money.

    (6) "Bodily injury" or "property damage".

    (7) The insured's failure to comply with any:

        (a) Workers Compensation law;

        (b) Unemployment Insurance law;

        (c) Social Security or Disability Benefits law; or

        (d) similar law.

    (8) The failure of any insurer to perform a contract.

    (9) The failure of any investment to perform.

    (10) The advice given by an insured to participate or not participate in any "public employee benefits" or "private employee benefits" plans.

    (11) A lack of funds to meet any obligation under any "public employee benefits" or "private employee benefits" plan.

3.  **SUPPLEMENTARY PAYMENTS**

We will pay, with respect to any claim or "suit" we defend:

a.  All expenses we incur.

**Page 2 of 5 Pages**



EXHIBIT A Pg 4

b.  The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

c.  All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $100 a day because of time off from work.

d.  All costs taxed against the insured in the "suit".

e.  Pre-judgment interest awarded against the insured on the part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer.

f.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

4.  **LIMITS OF INSURANCE**

a.  The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

(1)  Insureds;

(2)  claims made or "suits" brought; or

(3)  persons or organizations making claims or bringing "suits".

b.  The Aggregate Limit is the most we will pay for damages due to all negligent acts, errors, or omissions insured under this endorsement.

c.  The Each Employee Limit is the most we will pay for all damages to any one employee including dependents and beneficiaries, subject to 4.b. above.

The limits of this insurance apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the endorsement period unless the endorsement period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

5.  **DEDUCTIBLE**

a.  A $1000 deductible applies to each claim made with respect to the insurance provided by this endorsement.

b.  Claims due to the same negligent act(s), error(s), or omission(s) of one or more of the insureds are a single claim, and only one deductible applies.

c.  We may pay all or part of the deductible in order to settle any claim. You will pay us promptly for any deductible amount we pay.

6.  **ADDITIONAL CONDITIONS**

a.  Duties In The Event of Injury, Claim or Suit.

(1)  You must see to it that we are notified as soon as practicable of any act, error or omission which may result in a claim under this insurance. Notice should include:

(a)  How, when and where the act, error or omission took place; and

**Page 3 of 5 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-067


EXHIBIT A, Pg. 42

    (b) the names and addresses of any injured persons and witnesses.

  (2) If a claim is received by an insured you must:

    (a) Immediately record the specifics of the claim and the date received; and

    (b) Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim as soon as practicable.

  (3) You and any other involved insured must:

    (a) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

    (b) authorize us to obtain records and other information;

    (c) cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

    (d) assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "damages" to which this insurance may also apply.

  (4) No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**b.** Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under this endorsement our obligations are limited as follows:

  (1) Primary Insurance

    This insurance is primary except when (2) below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in (3) below.

  (2) Excess Insurance

    This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

    (a) That is effective prior to the beginning of the effective date of this insurance and applies to damages on other than a claims-made basis, if;

      (i) no Retroactive Date applies to this insurance; or

      (ii) the other insurance has a policy period which continues after the Retroactive Date shown in the Schedule of this endorsement.

    When this insurance is excess, we will have no duty to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

    When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any that exceeds the sum of:

    (a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**Page 4 of 5 Pages**

AGREED 6/1/04
Copyright © 2004 James R. Favor

JRF-FSL-067



(b)  The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Schedule of this endorsement.

(3)  Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also.  Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

## 7.  ADDITIONAL DEFINITIONS

As respects the insurance provided by this endorsement:

a.  "Management", when performed by you or a person designated by you, means:

(1)  Counseling employees, including their dependents and beneficiaries, but only with respect to "private employee benefits";

(2)  interpreting "private employee benefits";

(3)  handling "public employee benefits" and "private employee benefits" records; and

(4)  enrollment, termination, or cancellation of employees under "public employee benefits" or "private employee benefits".

b.  "Private Employee Benefits" means:

(1)  Group Life Insurance;

(2)  Group Accident or Health Insurance;

(3)  Profit-Sharing plans;

(4)  Pension plans;

(5)  Employee stock subscription plans; and

(6)  Employee travel, vacation, or savings plans.

c.  "Public Employee Benefits" means:

(1)  Worker's Compensation;

(2)  Unemployment Insurance;

(3)  Social Security; and

(4)  Disability Benefits Insurance.

All other terms and conditions remain unchanged.

**Page 5 of 5 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-067


EXHIBIT A, Pg. 4

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EMPLOYEE BENEFITS LIABILITY – EXTENDED REPORTING PERIOD

The insurance provided under the Employee Benefits Liability endorsement is subject to the following additional provisions:

1. A claim first made against the insured during the Extended Reporting Period shown below, due to a negligent act, error or omission committed or alleged to be committed prior to the inception date of this period and which would be otherwise insured by the endorsement, will be deemed to have been made on the last day of the Employee Benefits Liability endorsement.

2. If you obtain other insurance, which replaces the insurance provided by the Employee Benefits Liability endorsement, the Extended Reporting Period shown below will end on the effective date of the other insurance.

Extended Reporting Period from    **Inception**    to    **90 Days After Policy Ends**

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-068

EXHIBIT A, Pg. 45

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIMITED EMPLOYMENT PRACTICES LIABILITY (CLAIMS MADE)

This endorsement provides additional coverage for Limited Employment Practices Liability as follows:

With respect to the additional coverage provided by this endorsement only, certain provisions of the General Liability Coverage Form JRF-FSL-062 are amended and replaced as set forth below. The limits of Insurance for this additional coverage are shown in the schedule below.

1. **INSURING AGREEMENTS:**

   A) We will pay those sums in excess of the agreed deductible that you become legally obligated to pay as damages by reason of any covered "Employment Practices Claim" made during the policy period.

   B) We will pay any "Legal Expenses" in excess of the agreed deductible that you incur which arise out of any covered "Employment Practices Claim" made during the policy period.

2. **EXCLUSIONS:**    This insurance does not apply to:

   A) Legal expenses involving disputes with respect to this insurance including questions as to whether claims are payable under this endorsement.

   B) Any suit or action alleging dishonesty or criminal acts including conspiracy with another party; however you shall be reimbursed for all amounts which would have been collectible under this endorsement if such allegations are not subsequently proven.

   C) Any suit or action involving any circumstance of which you were aware prior to the effective date of this endorsement.

   D) Fines, penalties, punitive, exemplary or non-compensatory damages.

   E) Any claims for which you are entitled to insurance coverage or indemnification from any other source, or where coverage is provided elsewhere in this policy.

   F) Any suit or action involving or imposed upon you under the "Employment Retirement Income Security Act of 1974".

   G) Any suit or action for which you may be held liable under any Worker's Compensation, Occupational Disease, Unemployment Compensation, Disability Benefits or under any similar law.

**Page 1 of 4 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-069


EXHIBIT A, Pg. 46

## 3. LIMITS OF INSURANCE:

A) The Limits of Insurance and the rules shown below fix the most we will pay regardless of the number of;

1) Insureds,

2) Claims made or "suits" brought or,

3) Parties making claims or bringing "suits".

The Each Claim Limit is the most we will pay for one claim.

The Aggregate Limit is the most we will pay for all claims insured under this endorsement during the Policy Period.

B) The Limits of Insurance are as follows:

1) $250,000 Each Claim.  2) $1,000,000 Annual Aggregate.

## 4. DEDUCTIBLE:

A) A deductible of $ (See Deductible Endorsement JRF-FSL-061) applies to each and every claim made with respect to the insurance provided by this endorsement.

B) All Claims arising out of the same or a related course of conduct shall be considered as a single claim.  The Each Claim Limit and Deductible shall apply to such claim.

C) We may pay all or part of the deductible in order to settle any claim.  You will pay us promptly for any deductible amount we pay.

## 5. ADDITIONAL CONDITIONS:

### A) Defense and Settlement.

(1) You shall not admit liability for nor settle any "Employment Practices Claim" or incur any expenses in connection therewith without written consent from us.  Upon advice of a claim covered by this endorsement we will name and appoint an attorney to defend you with respect to such claim.  You shall co-operate fully with us in such defense.  You shall bear any legal expenses incurred in excess of the limit of insurance.

(2) We retain the right to make such investigations, conduct negotiations and settle or compromise any "Employment Practices Claim" as we deem expedient.  We are not obligated to pay any claim after the aggregate limit of insurance has been exhausted by payment of expenses or settlements of claims.

**Page 2 of 4 Pages**

AGREED 6/1/04
Copyright © 2004 James R. Favor

JRF-FSL-069

EXHIBIT___A, Pg. 47

**B) Defense of a Counterclaim, or Similar Actions.**

If a counterclaim, cross complaint or similar action is filed against you in a suit, legal proceeding or action originally brought by you, then we have no obligation to provide coverage for such counterclaim, cross complaint or similar action.

**C) Prosecution of a Counterclaim, or Similar Actions.**

If a claim, which is covered under this endorsement, is made against you and you prosecute a counterclaim, cross complaint or similar action in defense of such claim, then we will pay any legal expenses incurred subject to the limit of insurance.

**D) Appeals.**

Any and all appeals shall be considered to be part of the underlying lawsuit and treated as a single claim. We will pay any legal expenses incurred in prosecuting or defending such appeals, subject to the limit of insurance.

**E) Recovery and Subrogation.**

In the event that you receive any other reimbursement from any other party in respect of an "Employment Practices Claim", then we will be entitled to recover from you any and all sums we have paid with regard to such "Employment Practices Claim".

We retain the right to exercise rights of subrogation in your name at our own expense. You shall do nothing to prejudice our Recovery or Subrogation rights. You shall give us any assistance that we may require and supply any documents necessary to enable us to bring suit, demand arbitration or seek subrogation.

You shall do nothing to prejudice our rights in respect of the above.

**6. DEFINITIONS:**

**"Claim"** means:

A claim will be deemed to have been made when notice of such claim is received and recorded by any insured or us, whichever is first.

All claims arising out of the same or related conduct will be deemed to be one claim and to have been made at the time the first of those claims is made against any insured.

Written notice of a potential claim given by any insured during the policy period from which a claim subsequently arises shall be considered a claim made during the policy period.

**Page 3 of 4 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-069


EXHIBIT A, Pg. 48

**"Employment Practices Claim"** means:

A) A lawsuit filed against you as a result of:

1) Any of your employees, former employees or applicants for employment who allege discrimination on the basis of race, religion, age, sex, nationality or physical handicap.

2) Any of your employees or former employees who allege sexual harassment.

3) Any of your former employees who allege wrongful termination of employment.

B) The institution of a charge filed by any of your employees, former employees or applicants for employment against you with the United States Equal Opportunity Commission or a State or Local Agency responsible for fair Employment Practices Laws.

**"Legal Expenses"** means:

The fees of attorneys appointed by us for legal services rendered and the attorney's associated expenses.

All other terms and conditions remain unchanged.

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-069

EXHIBIT A, Pg. 49

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## HIRED AND NONOWNED AUTOMOBILE LIABILITY

Insurance is provided only for those coverages for which a limit is shown in the schedule below.

With respect to the insurance provided by this endorsement:

**A. SECTION I – COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

Insuring Agreement is amended by adding the following:

**1. HIRED AUTO LIABILITY**

The insurance provided under COVERAGE A (Section I) applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your employees in the course of your business.

**2. NON-OWNED AUTO LIABILITY**

The insurance provided under COVERAGE A (Section I) applies to "bodily injury" or "property damage" arising out of the use of any "non-owned auto" in your business by any person other than you.

**B. EXCLUSIONS**

1.  The exclusions, under COVERAGE A (Section I), other than exclusions a, b, d, f and i and the Nuclear Energy Liability Exclusion (Broad Form) are deleted and replaced by the following:

    a.  "Bodily injury";

       (1) To an employee of the insured arising out of and in the course of employment by the insured; or

       (2) To the spouse, child, parent, brother or sister of that employee as a consequence of (1) above.

       This exclusion applies:

       (1) Whether the insured may be liable as an employer or in any other capacity; and

       (2) To any obligation to share damages with or repay someone else who must pay damages because of injury.

       This exclusion does not apply to:

       (1) Liability assumed by the insured under an "insured contract"; or

       (2) "Bodily injury" arising out of and in the course of domestic employment by the insured unless benefits for such injury are in whole or in part either payable or required to be provided under any workers compensation law.

    b.  "Property damage" to:

       (1) Property owned or being transported by, or rented or loaned to the insured; or

**Page 1 of 4 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-070

EXHIBIT A, Pg. 50

(2) Property in the care, custody or control of the insured.

c. "Bodily injury" or "property damage" resulting from the handling of property:

   (1) Before it is moved from the place where it is accepted by the "insured" for movement into or onto the "hired auto" or "non-owned auto" or

   (2) After it is moved from the "hired auto" or "non-owned auto" to the place where it is finally delivered by the "insured."

d. "Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the "hired auto" or "non-owned auto".

## C. WHO IS AN INSURED

1. WHO IS AN INSURED (Section II) is replaced by the following:

   Each of the following is an insured under this insurance to the extent set forth below:

   a. You;

   b. Any other person using a "hired auto" with your permission;

   c. With respect to a "non-owned auto", any partner or executive officer of yours, but only while such "nonowned auto" is being used in your business;

   d. any other person or organization, but only with respect to their liability because of acts or omissions of an insured under a., b., or c. above.

   None of the following is an insured:

   a. Any partner or executive officer with respect to any "auto" owned by such partner or officer or a member of his or her household;

   b. Any person while employed in or otherwise engaged in duties in connection with an "auto business";

   c. The owner or lessee (of whom you are a sub-lessee) of a "hired auto" or the owner of a "non-owned auto" or any agent or employee of any such owner or lessee;

## D. LIMITS OF INSURANCE

The limit of insurance stated below as per "accident" shall apply:

1. Regardless of the number of covered autos, insureds, claims made or vehicles involved in the accident, the most we will pay for all damages resulting from any one "accident" is the LIABILITY INSURANCE limit shown in the schedule.

2. To all "bodily injury" and "property damage" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident;"

3. and, the general aggregate limit on the declarations does not apply to the insurance provided by this endorsement.

**Page 2 of 4 Pages**

AGREED 6/1/04
Copyright © 2004 James R. Favor

JRF-FSL-070

EXHIBIT _A_, Pg. 51

**E.  DEFINITIONS**

1.  The following additional definitions apply:

"Accident" includes continuous or repeated exposure to the same conditions resulting in bodily injury or property damage the insured neither expected nor intended.

"Auto business" means the business or occupation of selling, repairing, servicing, or parking "autos".

"Hired auto" means any "auto" you lease, hire or borrow.  This does not include any "auto" you lease, hire, or borrow from any of your employees or members of their households, or from any partner or executive officer of yours.

"Non-owned auto" means any "auto" you do not own, register, lease, hire or borrow which is used in connection with your business.

2.  The following is added to the definition of "insured contract";

h.  That part of any contract or agreement entered into, as part of your business, by you or any of your employees pertaining to the rental or lease of any "auto;"

However, an "insured contract" does not include that part of any contract or agreement:

1.  That pertains to the loan, lease or rental of any "auto" to you or any of your employees, if the "auto" is loaned, leased or rented with a driver; or

2.  That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of an "auto" over a route or territory that person or organization is authorized to serve by public authority.

**Page 3 of 4 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-070


EXHIBIT A, Pg 52

# HIRED AND NONOWNED AUTOMOBILE LIABILITY

## SCHEDULE

Nonownership Liability

Limit of Insurance
**$1,000,000**    , per accident

| SCHEDULE FOR NON-OWNERSHIP LIABILITY | | |
|---|---|---|
| NAMED INSURED'S BUSINESS | RATING BASIS | NUMBER |
| Other than a Social Service Agency | Number of Employees<br>Number of Partners | **INCLUDED** |
| Social Service Agency | Number of Employees<br>Number of Volunteers | |

Hired Automobile Liability

Limit of Insurance
**$1,000,000**    , per accident

| SCHEDULE OF HIRED AUTO COVERAGE AND PREMIUMS | | |
|---|---|---|
| LIABILITY COVERAGE – RATING BASIS, COST OF HIRE | | |
| STATE | ESTIMATED COST OF HIRE<br>FOR EACH STATE | RATE PER EACH $100<br>COST OF HIRE |
| **U.S.A.** | **IF ANY** | **INCLUDED** |

All other terms and conditions remain unchanged.

**Page 4 of 4 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-070

 EXHIBIT A, Pg. 53

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (BROAD FORM)

1.    The insurance does not apply:

    A.   Under any Liability Coverage, to "bodily injury" or "property damage":

        (1)   With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (2)   Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B.   Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

    C.   Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

        (1)   The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

        (2)   The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an "insured"; or

        (3)   The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2.    As used in this endorsement:

    "Hazardous properties" include radioactive, toxic or explosive properties;

    "Nuclear material" means "source material", "special nuclear material" or "by-product material";

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

### Page 1 of 2 Pages

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

**JRF-FSL-071**



"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a)    Any "nuclear reactor";

(b)    Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c)    Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d)    Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

All other terms and conditions remain unchanged.

**Page 2 of 2 Pages**

AGREED 6/1/04
Copyright © 2004 James R. Favor

JRF-FSL-071

EXHIBIT A, Pg 55

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## Absolute Microorganism Exclusion

This policy does not insure any loss, damage, claim, cost expense or other sum directly or indirectly arising out of or relating to:

> mold, mildew, fungus, spores or other microorganism of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.

This exclusion applies regardless whether there is (i) any physical loss or damage to insured property; (ii) any insured peril or cause, whether or not contributing concurrently or in any sequence; (iii) any loss of use, occupancy, or functionality; or (iv) any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.

This exclusion replaces and supercedes any provision in the policy that provides insurance, in whole or in part, for these matters.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-072

EXHIBIT __A__ Pg.__56__

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## Biological or Chemical Materials Exclusion

It is agreed that this Insurance excludes loss, damage, cost or expenses of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials regardless of any other cause or event contributing concurrently or in any other sequence thereto.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

NMA 2962
AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-073

EXHIBIT A Pg. 57

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## TOTAL ASBESTOS EXCLUSION

IN CONSIDERATION OF THE PREMIUM CHARGED FOR THIS INSURANCE, IT IS HEREBY UNDERSTOOD AND AGREED THAT THIS CONTRACT SHALL NOT APPLY TO AND DOES NOT COVER ANY ACTUAL OR ALLEGED LIABILITY WHATSOEVER FOR ANY CLAIM OR CLAIMS IN RESPECT OF LOSS OR LOSSES DIRECTLY OR INDIRECTLY ARISING OUT OF, RESULTING FROM OR IN CONSEQUENCE OF, OR IN ANY WAY INVOLVING ASBESTOS, OR ANY MATERIALS CONTAINING ASBESTOS IN WHATEVER FORM OR QUANTITY

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-074

EXHIBIT A, Pg. 58

# U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
## NOT PURCHASED CLAUSE

This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.

It is hereby noted that the Underwriters have made available coverage for the "insured losses"" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002" as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

**Page 1 of 1 Pages**

LMA 5053 (22/12/05)
AGREED 1/1/06
*Copyright © 2006 James R. Favor*

JRF-FS-002A

EXHIBIT A, P .59

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## War and Terrorism
## Exclusion Endorsement

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

(1)    war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

(2)    any act of terrorism.
        For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s) committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to (1) and/or (2) above.

If the underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

NMA 2918 (08/10/01)
AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-075


EXHIBIT A, pg. 60

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIAL ENDORSEMENT # A.

## SPECIAL COVERAGE EXTENSION PRIMARY COVERAGE

It is agreed that General Liability Coverage Form JRF-FSL-062, Section IV – General Liability Conditions is hereby amended by the addition of section 9., and other terms and conditions as follows:

**9. Primary Insurance – "Primary Insureds"**

If any other insurance with any other insurer is available to any "Primary Insureds" covering any loss which may also be covered hereunder, the coverage afforded by this policy on behalf of any "Primary Insureds" shall specifically be primary over any other insurance, whether primary, excess, contingent or on any other basis. We will have the right and duty to defend any "suit" seeking damages against "Primary Insureds" to which this insurance applies. However, we will have no duty to defend an insured against any "suit" to which this insurance does not apply.

Because this insurance is specifically intended to be primary coverage for "Primary Insureds", if any other insurance with any other insurer is available to any "Primary Insureds" covering any loss which may also be covered hereunder, such other insurance shall specifically be in excess of and shall not contribute with this insurance.

**ADDITIONAL DEFINITION**

"Primary Insureds" means: All insureds for which this policy affords coverage except "Chapters", "Colonies", and "Undergraduate Insureds".

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## <u>SPECIAL ENDORSEMENT # B.</u>

## <u>LIMITED HAZING COVERAGE</u>

It is agreed that General Liability Coverage Form JRF-FSL-062, Section V. Definitions, 3. "Bodily Injury" and 9. "Occurrence", and other terms and conditions are hereby amended as follows:

**I.   HAZING LIABILITY COVERAGE:**

   The definitions of "Bodily Injury" & "Occurrence" included in Form JRF-FSL-062 are extended to include the term "hazing", and this policy is agreed to afford limited "Hazing" coverage.

**II.  SPECIAL ADDITIONAL HAZING EXCLUSION:**

   This coverage does not apply to any insured that directs others to participate, and/or participates in hazing.

**III. ADDITIONAL DEFINITION**

   As used in this policy "Hazing" means without limitation:

   Any act or situation created by any insured, with or without the consent of another party, including punishment, harassment, disturbance, embarrassment, intimidation, ill-treatment, discomfort, personal abuse, persistent torment, criticism, or ridicule, of a physical or mental nature, which is imposed upon any person via the execution upon them, their subjection to, or the extraction from them of any unnecessary, needless, unpleasant, disagreeable, difficult, absurd, abusive, offensive, or ridiculous, tricks or tasks, including those of a foolish, deceptive, or fraudulent nature.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-077

EXHIBIT A, Pg. 62 

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIAL ENDORSEMENT # C.

## LIMITED SEXUAL ABUSE OR MISCONDUCT COVERAGE

It is agreed that General Liability Coverage Form JRF-FSL-062, Section V. Definitions, 3. "Bodily Injury" and 9. "Occurrence", and other terms and conditions are hereby amended as follows:

### I.   "SEXUAL ABUSE OR MISCONDUCT" LIABILITY COVERAGE:

The definitions of "Bodily Injury" & "Occurrence" included in Form JRF-FSL-062 are extended to include the term "Sexual Abuse or Misconduct", and this policy is agreed to afford limited "Sexual Abuse or Misconduct" coverage.

### II.  SPECIAL ADDITIONAL EXCLUSION "SEXUAL ABUSE OR MISCONDUCT"

This coverage does not apply to any insured that directs others to participate, and/or participates in "Sexual Abuse or Misconduct".

### III. ADDITIONAL DEFINITION

As used in this policy, "Sexual Abuse or Misconduct" means: any form of sexually abusive behavior whether physical, mental, or emotional.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 6/1/04
*Copyright © 2004 James R. Favor*

JRF-FSL-078

EXHIBIT A, Pg. 63

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIAL ENDORSEMENT # D.

## SPECIAL ADDITIONAL EXCLUSION

## ASSAULT AND / OR BATTERY

It is agreed that the General Liability Coverage Form JRF-FSL-062, Section I, 2. Exclusions and other terms and conditions are hereby amended as follows:

### I. SPECIAL ADDITIONAL EXCLUSION – "ASSAULT AND / OR BATTERY"

No insurance coverage afforded by this policy shall apply to any insured for any claim arising out of, in any way related to, or in any way resulting from any "Assault and / or Battery".

This exclusion applies only to any insured that directs others to participate, and / or participates in the excluded act.

### II. ADDITIONAL DEFINITION

"Assault and / or Battery" means:  The terms as defined by the state statutes of the state in which the assault and / or battery allegedly occurred.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 8/14/07
*Copyright © 2004 James R. Favor*

JRF-FSL-079



# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIAL ENDORSEMENT # E.

## SPECIAL ADDITIONAL EXCLUSION

## VIOLATIONS OF FRATERNITY ALCOHOL POLICY

It is agreed that this special exclusion applies to all General Liability Coverage afforded by this policy and this exclusion applies to and supersedes all other policy terms and conditions:

### I. SPECIAL ADDITIONAL EXCLUSION – "VIOLATIONS OF FRATERNITY ALCOHOL POLICY"

No insurance coverage afforded by this policy shall apply to any "Chapter", "Colony", or "Undergraduate Insureds" for any claim arising out of, in any way related to, or in any way resulting from any "Violation" of "Fraternity Alcohol Policy".

### II. ADDITIONAL DEFINITIONS

"Fraternity Alcohol Policy" means: The written rules, regulations, or procedures regarding alcohol, which are established by the First Named Insured or the "Chapter" or "Colony" at the time of loss.

"Violation" means: Determination by the executive board of the First Named Insured, or legal authority that some breaking, infraction, or breach of "Fraternity Alcohol Policy" occurred.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 8/14/07
*Copyright © 2004 James R. Favor*

JRF-FSL-080

EXHIBIT A, Pg. 65

# FRATERNITY / SORORITY INSURANCE PROGRAM
# GENERAL LIABILITY COVERAGE

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## SPECIAL ENDORSEMENT # F.

## PUNITIVE DAMAGES

It is agreed that General Liability Coverage Form JRF-FSL-062, Section V. Definitions. 1. "Advertising Injury", 3. "Bodily Injury", 10. "Personal Injury", 12. "Property Damage" and other terms and conditions are hereby amended as follows:

### I.  "PUNITIVE OR EXEMPLARY DAMAGES"

The definitions of "Bodily Injury", "Property Damage", "Personal Injury" and "Advertising Injury" included in Form JRF-FSL-062 are understood to include "Punitive or Exemplary Damages", and this policy is agreed to afford coverage for "Punitive or Exemplary Damages" provided such damages are insurable under the law of the state in which such damages are awarded.

### II.  ADDITIONAL DEFINITION

"Punitive or Exemplary Damages" means:  The terms as defined by the state statutes of the state in which a suit is filed requesting such damages.

All other terms and conditions remain unchanged.

**Page 1 of 1 Pages**

AGREED 8/14/07
*Copyright © 2004 James R. Favor*

JRF-FSL-081

EXHIBIT A, Pg. 65

Exhibit "B"

1  DOUGLAS E. FIERBERG (*pro hac vice*)
   MARIAN RIEDY (*pro hac vice*)
2  **BODE & GRENIER, LLP**
   1150 Connecticut Avenue NW, Ninth Floor
3  Washington, DC  20036
   Telephone: (202) 828-4100
4  Fax: (202) 828-4130

5  IVO LABAR (203492)
   KELLY A. CORCORAN (260268)
6  **KERR & WAGSTAFFE LLP**
   100 Spear Street, Suite 1800
7  San Francisco, CA 94105–1528
   Telephone: (415) 371-8500
8  Fax: (415) 371-0500

9  STEVEN J. ADAMSKI (103977)
   DAVID C. CUMBERLAND (93719)
10 **ADAMSKI MOROSKI MADDEN & GREEN LLP**
   Mailing Address: Post Office Box 3835
11 San Luis Obispo, California 93403-3835
   Physical Address: 6633 Bay Laurel Place
12 Avila Beach, California 93424
   Telephone: (805) 543-0990
13 Fax: (805) 543-0980

14                    **SUPERIOR COURT OF CALIFORNIA**

15                    **COUNTY OF SAN LUIS OBISPO**

| | |
|---|---|
| 16  H. SCOTT STARKEY and JULIA K. STARKEY, individuals, and Co-Administrators of the Estate of CARSON L. STARKEY | Case No. |
| 17 | **FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVAL ACTION BASED ON:** |
| 18           Plaintiffs, | |
| 19           vs. | |
| 20  SIGMA ALPHA EPSILON FRATERNITY, an Illinois corporation, individually, and t/a the | **(1) NEGLIGENCE (Failure to Manage and Supervise);** |
| 21  California Tau, California Polytechnic State University, San Luis Obispo; | **(2) VIOLATION OF PENAL CODE § 245.6 ("MATT'S LAW");** |
| 22  SIGMA ALPHA EPSILON FOUNDATION, an Illinois corporation, individually, and t/a Sigma | |
| 23  Alpha Epsilon Fraternity; | **(3) NEGLIGENCE PER SE (Hazing);** |
| 24  SAE FINANCIAL AND HOUSING CORPORATION, an Ohio corporation, | **(4) NEGLIGENCE (Assumed Duty);** |
| 25  individually, and t/a Sigma Alpha Epsilon Fraternity; | **(5) NEGLIGENCE (Duty to Prevent Harm);** |
| 26  SAE PROPERTIES HOLDINGS, INC., an | |
| 27  Ohio corporation, individually, and t/a Sigma Alpha Epsilon Fraternity; | **JURY TRIAL DEMANDED** |
| 28  BENNETT HOLDEN, individually, and as an | |

KERR
&
WAGSTAFFE
LLP

FIRST AMENDED COMPLAINT

EXHIBIT B, Pg.

1  agent of Sigma Alpha Epsilon and California
   Tau Chapter of Sigma Alpha Epsilon;
2  ZACARY ELLIS, individually, and as an agent
   of Sigma Alpha Epsilon and California Tau
3  Chapter of Sigma Alpha Epsilon;
4  MATT SILVA, individually, and as an agent of
   Sigma Alpha Epsilon and California Tau
5  Chapter of Sigma Alpha Epsilon;
   JAMIE MERKLER, individually, and as an
6  agent of Sigma Alpha Epsilon and California
   Tau Chapter of Sigma Alpha Epsilon;
7  CHRISTOPHER PERKINS, individually, and
8  as an agent of Sigma Alpha Epsilon and
   California Tau Chapter of Sigma Alpha Epsilon;
9  ADAM MARSZAL, individually, and as an
   agent of Sigma Alpha Epsilon and California
10 Tau Chapter of Sigma Alpha Epsilon; and
   DOES 1 through 25, inclusive, individually, and
11 as agents of Sigma Alpha Epsilon Fraternity and
12 California Tau Chapter of Sigma Alpha Epsilon;

13         Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B, Pg. 2

## INTRODUCTION

1.      This case arises from the perpetuation and execution of dangerous fraternity "traditions" by Sigma Alpha Epsilon ("SAE"), including the "Big Brother" ritual in which fraternity officers and members ceremonially introduce prospective members to their "family" and "family drink," which constituted a "brown bag" full of bottles of liquor that would ultimately render Carson Starkey helpless and lead to his death.  Fraternity officers and members, chanting "puke and rally," compel consumption of the "family drink" by underage students as a ritualistic display of worthiness and brotherhood as further described herein.

2.      "SAE" consists of five principal units—Defendants Sigma Alpha Epsilon Fraternity, Sigma Alpha Epsilon Foundation, SAE Financial and Housing Corporation, SAE Properties Holding, Inc., and Sigma Alpha Epsilon local chapters, including California Tau. These five purportedly distinct entities (collectively, "Fraternity Defendants" or "SAE") operate as a single enterprise, with the purposes of furthering the mission of SAE, as part of an elaborate operating structure the fraternity uses to fund its operations and escape financial responsibility for the dangerous conduct that goes on at its chapters, including the one at Cal Poly, San Luis Obispo.  SAE segregates its assets in other organizations like the Foundation, and then—when facing liability for a tragedy like Carson's death—claims that it has little assets and denies rights to and over the substantial assets held by other entities within its operating structure.  The Foundation, like SAE and the other entities within its operating structure, functions under the direction, control and supervision of the SAE Convention, is subject to common policies and procedures, and is used to advance the common, coordinated mission and business of SAE. These organizations have the same employees and directors.  SAE's liability arises individually and through its agents, the local SAE chapter at Cal Poly, California Tau, and its members.

3.      Drinking alcohol in excessive and dangerous amounts is by wide-spread tradition made a condition to joining the SAE fraternity and its lifelong "brotherhood," notwithstanding baseless denials of this fact by SAE.  That this and other dangerous traditions continue, year after year, is the result of SAE's flawed oversight and management of chapter and member activities undertaken to promote the national fraternity's local operations and business by recruiting new

members.  For years, SAE, like most other fraternities in the Greek industry, has willfully and consciously disregarded the safety of pledges and others by refusing to make meaningful changes.   Upon information and belief, SAE knew or should have known of the long-documented risk of death and serious injury posed by fraternity traditions like the "Big Brother" and "brown bag" events, and knew or should have known that SAE members continued such traditions notwithstanding fraternity and/or university risk management policies prohibiting such conduct.  Yet these Defendants deliberately/purposefully took no reasonable, effective measures to enforce risk management policies or stop long-standing and dangerous pledging traditions, and their acts and/or omissions therefore constituted not only gross negligence and/or reckless misconduct, but also were taken in conscious disregard of the dangers posed to pledges like Carson.

4.      As a direct consequence of SAE's acts and omissions, on December 1, 2008, Carson L. Starkey, a first semester freshman at Cal Poly, San Luis Obispo ("Cal Poly"), in the course of and as a necessary condition to pursuing membership in SAE, was instructed to finish his "brown bag" of liquor, and on December 2 he died of acute alcohol poisoning.

5.      Plaintiffs further allege that SAE is liable pursuant to Penal Code § 245.6 (e) ("Matt's Law"), and under principles of agency and *respondeat superior* for the misconduct of the local officers and members of SAE and who hazed Carson Starkey in violation of law and Cal Poly regulations.

6.      Plaintiffs allege that the individual Defendants were negligent and liable in failing to take reasonable care of and save Carson Starkey, whom they had put in a position of peril; and that the Fraternity Defendants are liable for the individual Defendants' negligence under principles of agency and *respondeat superior*.

## PARTIES

7.      Plaintiff H. Scott Starkey is Carson's natural father.  Plaintiff Julia K. Starkey is Carson's natural mother.  The Plaintiffs were duly appointed Co-Administrators of the Estate of Carson L. Starkey by a court of competent jurisdiction in Travis County, Texas, giving them full

KERR
&
WAGSTAFFE
LLP

– 2 –

FIRST AMENDED COMPLAINT

EXHIBIT _B_, Pg. 4

1    legal authority to maintain this action on behalf of the Estate.  This order is attached hereto as

2    Exhibit A.

3         8.      The Plaintiffs bring this action for wrongful death and survival damages pursuant

4    to Cal. Code Civ. Proc. § 377.60 *et seq.*, and § 377.30 *et seq.*

5         9.      Defendant Sigma Alpha Epsilon Fraternity ("Sigma Alpha Epsilon Fraternity") is

6    a non-profit corporation organized in the State of Illinois.

7         10.     Now and at all relevant times, SAE regularly transacts business in the State of

8    California and in San Luis Obispo County directly, through the chapter it established and

9    controlled at Cal Poly, Defendant California Tau, and through its numerous active and alumni

10   members who have been initiated pursuant to its policies and rituals and live in the state.

11        11.     Plaintiffs are informed and believe, and on that basis allege, that SAE, despite

12   reaping significant financial revenue from students at California universities, is not qualified to

13   do business in California as required by statute.

14        12.     Plaintiffs are informed and believe, and on that basis allege, that Defendant

15   California Tau is an unincorporated association that is chartered, governed, managed, and

16   controlled by SAE and the SAE Convention, and/or that SAE and the SAE Convention have the

17   rights to exercise control over the activities, assets, and members of California Tau, and that

18   California Tau is an agent of and acts for, under the direction, and on behalf of SAE.

19        13.     Plaintiffs are informed and believe, and on that basis allege, that SAE and the

20   SAE Convention manage and control the fraternity-related activities of its local chapter officers

21   and members, and/or that SAE has the right to exercise control over the fraternity-related

22   activities of its local chapter officers and members, and that its local chapter officers and

23   members are managers and agents of, and act for, under the direction, and on behalf of SAE.

24   Plaintiffs are further informed and believe, and on that basis allege, that California Tau is an alter

25   ego of SAE and that SAE uses California Tau as an extension of itself and for the purpose of

26   avoiding creditors, claims, and liabilities.

27        14.     Defendant Sigma Alpha Epsilon Foundation ("the Foundation") is a not-for-profit

28   corporation organized in the State of Illinois.  Plaintiffs are further informed and believe, and on

EXHIBIT B, Pg 5

1  that basis allege, that the Foundation is an alter ego of the other SAE entities, namely Defendants

2  Sigma Alpha Epsilon Fraternity, Sigma Alpha Epsilon Foundation, and California Tau and that

3  SAE uses the Foundation as an extension of itself and for the purpose of avoiding creditors,

4  claims, and liabilities.  Plaintiffs are further informed and believe, and on that basis allege, that

5  the Foundation is a funding source for SAE Fraternity, SAE Housing Corporation, California

6  Tau, and for other entities that pursue SAE's mission and business.  As a primary funding arm of

7  and for SAE, the Foundation is part of an elaborate operating structure the fraternity uses to

8  allow for tax-deductible contributions to fund its operations and escape and/or substantially

9  lessen and apportion financial responsibility for the dangerous conduct that goes on at its

10  chapters, including the one at Cal Poly, San Luis Obispo.  SAE segregates its assets in other

11  organizations like the Foundation, and then—when facing liability for a tragedy like Carson's

12  death—claims that it has little assets and denies rights to and over the substantial assets held by

13  other entities within its operating structure.  The Foundation, like SAE Fraternity and the other

14  entities within its operating structure, functions under the direction, control and supervision of

15  the SAE Convention, is subject to common policies and procedures, and is used to advance the

16  common, coordinated mission and business of SAE.

17      15.    Defendant Sigma Alpha Epsilon Financial and Housing Corporation ("F&H") is a

18  not-for-profit corporation organized in the State of Ohio.  Plaintiffs are further informed and

19  believe, and on that basis allege, that like the SAE Foundation, F&H is an alter ego of the other

20  SAE entities, namely Defendants Sigma Alpha Epsilon Fraternity, Sigma Alpha Epsilon

21  Foundation, and California Tau, and that SAE and the SAE Convention use F&H as an extension

22  of themselves and for the purpose of funding SAE operations and avoiding creditors, claims, and

23  liabilities.  Plaintiffs are further informed and believe, and on that basis allege, that the F&H is a

24  funding source for SAE, SAE Foundation, California Tau, and for other entities that pursue

25  SAE's mission and business.  As one of SAE's funding arms, F&H is part of an elaborate

26  operating structure the fraternity uses to attempt to escape and/or substantially lessen and

27  apportion financial responsibility for the dangerous conduct that goes on at its chapters,

28  including the one at Cal Poly, San Luis Obispo.  SAE segregates its assets in other organizations

KERR
WAGSTAFFE
LLP

– 4 –

EXHIBIT B Pg. 6

1    like F&H, and then—when facing liability for a tragedy like Carson's death—claims that it has

2    little assets and denies rights to and over the substantial assets held by other entities within its

3    operating structure. F&H, like SAE and the other entities within its operating structure,

4    functions under the direction, control and supervision of the SAE Convention, is subject to

5    common policies and procedures, and is used to advance the common, coordinated mission and

6    business of SAE.

7        16.    Defendant SAE Properties Holding, Inc. ("PHI") is a not-for-profit corporation

8    organized in the State of Ohio. Plaintiffs are further informed and believe, and on that basis

9    allege, that like the SAE Foundation and F&H, PHI is an alter ego of the other SAE entities,

10   namely Defendants Sigma Alpha Epsilon Fraternity, Sigma Alpha Epsilon Foundation, and

11   California Tau, and that SAE and the SAE Convention use PHI as an extension of itself and for

12   the purpose of funding SAE operations, holding its assets, and avoiding creditors, claims, and

13   liabilities. Plaintiffs are further informed and believe, and on that basis allege, that the PHI holds

14   real and other property for SAE, SAE Foundation, California Tau, and for other entities that

15   pursue SAE's mission and business. As an SAE entity, PHI is part of an elaborate operating

16   structure the fraternity uses to attempt to escape and/or substantially lessen and apportion

17   financial responsibility for the dangerous conduct that goes on at its chapters, including the one

18   at Cal Poly, San Luis Obispo. SAE segregates its assets in other organizations like PHI, and

19   then—when facing liability for a tragedy like Carson's death—claims that it has little assets and

20   denies rights to and over the substantial assets held by other entities within its operating

21   structure. PHI, like SAE, F&H, and the other entities within its operating structure, functions

22   under the direction, control and supervision of the SAE Convention, is subject to common

23   policies and procedures, and is used to advance the common, coordinated mission and business

24   of SAE.

25       17.    Plaintiffs are informed and believe that the SAE Fraternity, the Foundation, F&H,

26   PHI, and California Tau are used to advance the mission and business of SAE, and are operated

27   as a single enterprise.

28

EXHIBIT B, Pg.7

1        18.    Plaintiffs are informed and believe that Defendant Bennett Holden was at all

2  relevant times a member of SAE, in particular Sigma Alpha Epsilon Fraternity and California

3  Tau, and a citizen of California. Holden was the president of California Tau at the time of

4  Carson's death and he authorized, directed, or participated in the hazing events and/or the

5  subsequent misconduct involving Carson's incapacity and the failure to obtain the emergency

6  medical assistance needed to save his life, and was at all relevant times acting as an agent of and

7  within the scope of his agency with the Fraternity Defendants.

8        19.    Plaintiffs are informed and believe that Defendant Zacary Ellis was at all relevant

9  times a member of, in particular Sigma Alpha Epsilon Fraternity and California Tau, and a

10  citizen of California. Ellis was the pledge educator of California Tau at the time of Carson's

11  death and he authorized, directed, or participated in the hazing events and/or the subsequent

12  misconduct involving Carson's incapacity and the failure to obtain the emergency medical

13  assistance needed to save his life, and was at all relevant times acting as an agent of and within

14  the scope of his agency with the Fraternity Defendants.

15        20.    Plaintiffs are informed and believe that Defendant Matt Silva was at all relevant

16  times a member of SAE, in particular Sigma Alpha Epsilon Fraternity and California Tau, and a

17  citizen of California. Silva was the vice president of California Tau at the time of Carson's death

18  and he authorized, directed, or participated in the hazing events and/or the subsequent

19  misconduct involving Carson's incapacity and the failure to obtain the emergency medical

20  assistance needed to save his life, and was at all relevant times acting as an agent of and within

21  the scope of his agency with the Fraternity Defendants.

22        21.    Plaintiffs are informed and believe that Defendant Jamie Merkler was at all

23  relevant times a member of SAE, in particular Sigma Alpha Epsilon Fraternity and California

24  Tau, and a citizen of California. Merkler was the risk manager of California Tau at the time of

25  Carson's death and he authorized, directed, or participated in the hazing events and/or the

26  subsequent misconduct involving Carson's incapacity and the failure to obtain the emergency

27  medical assistance needed to save his life, and was at all relevant times acting as an agent of and

28  within the scope of his agency with the Fraternity Defendants.

– 6 –

EXHIBIT _B, Pg. 8_

1    22.    Plaintiffs are informed and believe that Defendant Christopher Perkins was at all
2    relevant times a member of SAE, in particular Sigma Alpha Epsilon Fraternity and California
3    Tau, and a citizen of California.  Perkins was an SAE Warden and pledge educator, and he
4    authorized, directed, or participated in the hazing events and/or the subsequent misconduct
5    involving Carson's incapacity and the failure to obtain the emergency medical assistance needed
6    to save his life, and was at all relevant times acting as an agent of and within the scope of his
7    agency with the Fraternity Defendants.

8    23.    Plaintiffs are informed and believe that Defendant Adam Marszal was at all
9    relevant times a member of SAE, in particular Sigma Alpha Epsilon Fraternity and California
10   Tau, and a citizen of California and residing at the property where Carson died.  Marszal
11   authorized, directed, or participated in the hazing events and/or the subsequent misconduct
12   involving Carson's incapacity and the failure to obtain the emergency medical assistance needed
13   to save his life, and was at all relevant times acting as an agent of and within the scope of his
14   agency with the Fraternity Defendants.

15   24.    The true names and capacities, whether individual, corporate, associate or
16   otherwise, of Defendants DOES 5 through 25, inclusive, are unknown to Plaintiffs, who
17   therefore sue said Defendants by such fictitious names pursuant to California Code section 474.
18   Plaintiffs further allege that each of said fictitious Defendants is in some manner responsible for
19   the acts and occurrences herein set forth.  Plaintiffs will amend this Complaint to show these
20   Defendants' true names and capacities when the same are ascertained, as well as the specific
21   manner in which each fictitious defendant is responsible.

22   25.    Plaintiffs are informed and believe, and on that basis allege, that at all times
23   mentioned in this Complaint, each defendant was an agent, manager, director, trustee, officer,
24   servant, employee, co-conspirator and/or joint venturer of each remaining defendant, and was at
25   all times acting within the course and scope of that agency, management, direction, trust, office,
26   servant, employment, co-conspiracy and/or joint venture.

27   **VENUE**
28

KERR
&
WAGSTAFFE
LLP

EXHIBIT B Pg 9

26.     Venue is appropriate in San Luis Obispo County because at least one of the defendants is a permanent resident of San Luis Obispo County and because the acts that give rise to this action occurred in San Luis Obispo County.

## GENERAL ALLEGATIONS/CARSON'S DEATH

27.     Carson Starkey matriculated at Cal Poly as a freshman in the fall of 2008.

28.     Carson had graduated in the top ten percent of his high school class in Austin, and aspired to become an architect.  He was a superb athlete.  He was a beloved brother and son.

29.     SAE recruits new undergraduate members at Cal Poly through its local authorized chapter, California Tau; members pay dues and convey other financial benefits to SAE.  SAE, like other national fraternities, knowingly permits its name to be advertised on Cal Poly's website, which promotes the fraternity, fraternity membership, and associated Greek life.

30.     In order to become SAE members, students must first receive a "bid" from the fraternity, and then must participate in a "pledge" or "initiation" process authorized, directed, and/or participated in by the defendants, individually, and/or through their agents, officers and/or members of SAE and California Tau.

31.     Shortly after leaving home and beginning his college career, the process known as "rush" began at Cal Poly, during which all fraternities affiliated with Cal Poly solicit new dues-paying undergraduate members for their national fraternities and local chapters, such as SAE and California Tau.  As a result, Carson accepted a bid from California Tau to join SAE and began the pledge process, along with sixteen other Cal Poly students, all under the legal drinking age.

32.     The pledge process lasted several weeks, and included several "tasks" which the pledges were required to complete, including a scavenger hunt in Santa Barbara.  One such event was called SOCO Night, which involved the consumption of Southern Comfort by pledges and exposure to the fraternity doctrine and night known as "Don't Fuck Your Brother Night."  Plaintiffs are informed and believe, and on that basis allege, that each week of the pledge process was designated by a name meant to signify particular fraternity traits or traditions.

33.     The week beginning on November 30 was designated "Big Bro" or "Big Brother week," during which the pledges, or "little brothers," were assigned or introduced

KERR
&
WAGSTAFFE
LLP

EXHIBIT B Pg 10

1  to a particular family within the fraternity and member designated as the pledge's "big brother."

2  This event, like virtually all other events planned by the fraternity for the pledges during this

3  particular week, involved the consumption of alcohol by the pledges, all of whom were under the

4  lawful age of consumption in the State of California.  Within general fraternity tradition,

5  including, upon information and belief, that of the Fraternity Defendants, pledges are instructed

6  to respect their big brother and follow his guidance and directions.

7      34.    On the pledge schedule for Monday, December 1, 2008, was "Brown Bag Night,"

8  a longstanding traditional event for SAE recruitment during Big Brother week.

9      35.    Carson and the other pledges were instructed to meet in a parking lot at Cal Poly

10  at about 9:00 p.m. Once gathered in the parking lot, the pledges were instructed to go to 551

11  Highland Drive, where defendant Marszal resided.

12      36.    Meanwhile, the SAE and California Tau members prepared the "Brown Bag"

13  event.

14      37.    Defendants Ibrahim, Taylor and Marszal purchased large quantities of alcohol

15  from two stores in San Luis Obispo.

16      38.    The big brothers selected bottles of alcohol for their little brothers, likely

17  corresponding with their traditional "family drink," which they put in a brown bag, one for each

18  pledge.  Defendant Ibrahim selected bottles of alcohol for the brown bag for Carson.

19      39.    The members instructed the pledges to bring tarps to 551 Highland Drive, which

20  were placed on the couches in the garage; a bucket was placed in the center of the room to

21  collect vomit.

22      40.    When the pledges arrived they were told to sit in a circle.  Each was given his

23  brown bag; a bottle of 151 proof Everclear liquor was also provided to the group.  The pledges

24  were told to drink all the liquor in their bags by midnight – spanning approximately ninety

25  minutes – and not to leave the garage.  The pledges drank while members stood watch.

26      41.    Plaintiffs are informed and believe, and on that basis allege, that several of the

27  pledges began consuming their designated alcohol rapidly, vomited numerous times, and passed

28

KERR
&
WAGSTAFFE
LLP

– 9 –

EXHIBIT B, Pg. 11

1    out.  Plaintiffs are informed and believe that all pledges began consuming alcohol and vomited.

2    The fraternity officers and members began a ritual chant, "puke and rally."

3        42.    Carson became increasingly ill from excessive alcohol consumption, and within a

4    short period of time became unresponsive.  Carson was drooling and could not walk on his own.

5    He stood up, wobbled, and fell down.

6        43.    Plaintiffs are informed and believe, and on that basis allege, that the individual

7    defendants knew that Carson had consumed too much alcohol as a result of these initiation

8    activities, did not "look good," was ill, and unable to walk or take care of himself.  These

9    defendants then undertook to make and control decisions regarding his care, including

10   determining whether to throw him in a cold shower or drive him to the hospital.

11       44.    Plaintiffs are informed and believe, and on that basis allege, that Defendants Ryan

12   Taylor, Merkler, and Perkins put Carson in a vehicle and started to drive him to obtain medical

13   care, first stripping him of his pledge pin and pledge book, reflecting unbridled loyalty to the

14   Fraternity Defendants by disassociating the Fraternity Defendants from what had happened to

15   Carson.  Carson spit up in the vehicle.  Despite believing based upon the circumstances that

16   Carson required emergency medical care, which was only a short distance away, these

17   defendants aborted the trip and returned Carson to 551 Highland Drive.  Neither these nor any

18   other defendants continued monitoring Carson, or obtained the medical help that was obviously

19   required under the circumstances.

20       45.    Instead, Plaintiffs are informed and believe, and on that basis allege, that Carson

21   was placed in a small utility room near the kitchen at 551 Highland Drive and there left alone.

22       46.    At or around 6:24 a.m. on Tuesday, December 2, Emergency Services received a

23   call requesting service at the Highland Drive location.  Upon arrival, emergency medical

24   personnel found Carson to be unresponsive.  He was taken to Sierra Vista Regional Medical

25   Center where he was pronounced dead.

26       47.    Carson died from acute alcohol poisoning.

27

28

KERR
&
WAGSTAFFE
LLP

                    – 10 –

EXHIBIT B Pg. 12

1    48.    Had Carson received proper care during the hours before an SAE member finally

2    called 911, during the extended period of time during which he was suffering and slowly

3    succumbing to alcohol poisoning, he would have survived unharmed.

4    49.    Defendants Ibrahim, Ellis, Taylor, and Marszal were criminally charged with

5    hazing and illegal provision of alcohol to a minor.

6    **GENERAL ALLEGATIONS/BACKGROUND**

7    50.    It is widely published, known by, and documented in the fraternity industry that

8    this type of ritualistic evening and event – involving family drinks and the provision of alcohol

9    by a "big brother" to his "little brother" – is one of the so-called "three deadliest nights" for

10    pledges.  Historically, numerous young students seeking to join fraternities across the country

11    have died from alcohol poisoning as a result of being provided and compelled to consume

12    alcohol at a Big Brother event.

13    51.    Statistics, insurance claims analyses, studies and reports, and widely known

14    incidents of catastrophic injury and death have *for decades* demonstrated the foreseeable risk of

15    dangerous injury and death from the excessive consumption of alcohol by prospective new

16    members during fraternity bid, pledge, Big Brother and other initiation events in which

17    participation is required for admission to the brotherhood.  In 2006, SAE consorted with

18    approximately six other fraternities to purchase the insurance brokerage firm, James R. Favor,

19    which is an exclusive broker for Lloyds of London high-risk insurance products in the fraternity

20    industry.  James R. Favor's promotional materials attest to unparalleled risks likely known by

21    SAE, stating prominently on its website that its history includes handling more than 5,000 claims

22    involving fraternities resulting in approximately $50,000,000 in recoveries.  The other six

23    fraternities with whom SAE has established a business relationship directly connected to risk

24    management practices and industry risks are Lambda Chi Alpha, Phi Delta Theta, Pi Kappa

25    Epsilon, Sigma Alpha Mu, Sigma Chi, and Triangle.  Most of SAE's fraternity business partners,

26    and those other fraternities for whom it brokers insurance, have had students die, or, likely,

27    suffer numerous injuries, as a result of hazing or other fraternity related activities involving the

28    abuse and misuse of alcohol.  The known deaths, spanning decades of misconduct, include,

EXHIBIT B, Pg. 13

1    without limitation: <u>Sigma Alpha Mu</u>: 1972, Brian Cursack at the University of Maryland; <u>Sigma</u>

2    <u>Chi</u>: 1982, two pledges died at the University of Virginia; <u>Lamda Chi Alpha</u>: 1985, the death of a

3    rushee at the University of Missouri, 1988, the death of a pledge, James Callahan, at Rutgers

4    University, 1997, and the deaths of two pledges, Brian Sanders and Brian Pierce, at the

5    University of California, Los Angeles, as a result of hazing and the unlawful provision of alcohol

6    to pledges by fraternity members; <u>Phi Delta Theta</u>, 1993, the death of a pledge, Chad Saucier, at

7    Auburn University, and, 1998, the death of Courtney Cantor at the University of Michigan who

8    fell following pledge activities involving her sorority and Phi Delta Theta; <u>Sigma Chi</u>, 1998, the

9    suicide death of a pledge at the University of Mississippi who had allegedly been hazed, and,

10    2004, the death of a pledge, Blake Hammontree, at the University of Oklahoma, who was found

11    dead on the fraternity floor at an alcohol related pledge event; <u>Sigma Alpha Mu</u>: 2008, the death

12    of a pledge, Brett Griffin, at the University of Delaware resulting from fraternity hazing and the

13    unlawful provision of alcohol at a Big Brother – Little Brother tradition.  Deaths of its insureds

14    include, among a likely significant number, Daniel Reardon, resulting from a hazing ritual at the

15    University of Maryland chapter of Phi Sigma Kappa.  In 1998, PSK concluded that its risk-

16    management policy is "not unilaterally working."  That policy, still in effect and essentially

17    unchanged today, is virtually identical to the dangerously flawed policy implemented by SAE.

18    As a result, SAE had, at all times relevant hereto, access to and specialized knowledge of

19    information, research, and claims histories confirming a staggering number of serious injuries

20    and deaths from Greek activities, and the foreseeable risk of further injury and death should its

21    activities, traditions, and risk management strategies continue without meaningful change.

22       52.     In the late 1980s, the Fraternity Insurance Purchasing Group ("FIPG"), a different

23    consortium of Greek organizations organized to coordinate their risk management strategies and

24    assist each other in the purchase of insurance, widely published that "fraternities and sororities

25    were ranked by the National Association of Insurance Commissioners as the sixth worst risk for

26    insurance companies - just behind hazardous waste disposal companies and asbestos

27    contractors."  Also in the 1980s, SAE's former Educational and Leadership Consultant, Bruce D.

28    Hornbuckle, published an informational pamphlet for his fraternity entitled "Death by Hazing,"

EXHIBIT B, Pg. 14

1   reflecting his and the fraternity's knowledge about the dangers of out of control or improperly

2   supervised fraternity rituals, stating in part: "As of 1998, Mrs. Stevens [her son Chuck died from

3   fraternity hazing at Alfred University in 1978] had documented at least 93 hazing-related deaths,

4   74 of which had occurred since 1970, 42 since Chuck died.  New York Times Education Editor

5   Fred M. Hechinger reports at least 39 fraternity hazing deaths occurred between 1979 and 1986.

6   Ann Landers cites 26 deaths between 1980 and 1986."

7       53.    In 1997, the National Interfraternity Council ("NIC"), then comprising 66 Greek

8   national organizations with 5500 chapters on 800 campuses throughout the United States and

9   Canada, analyzed certain risks associated with Greek organizations and housing and concluded

10  that improper fraternity oversight of alcohol was "frighteningly pervasive."

11      54.    A well-known survey conducted by Harvey Wechsler of the Harvard School of

12  Health in 2001 showed that three-quarters of fraternity and sorority members are binge drinkers.

13  As Dr. Wechsler put it in his book on the subject "Dying to Drink," "the single strongest

14  predictor of binge drinking is fraternity or sorority residence or membership."

15      55.    The National Center on Addiction and Substance Abuse at Columbia University

16  ("CASA"), reported in "Wasting the Best and the Brightest: Substance Abuse at America's

17  Colleges and Universities," that binge drinking in Greek housing is 89% higher than it is for

18  students in university housing, and that fraternity officers are the worst substance abusers of all,

19  by a wide margin.

20      56.    CASA also reports that rates of excessive drinking and the proportion of students

21  injured as a result of drinking between 1993 and 2001 have increased.

22      57.    Expert studies and reports demonstrate that drinking by prospective new fraternity

23  members is particularly dangerous – and often deadly -- because of the context in which these

24  events or "rituals" occur.  The prospective members -- recent members of the campus community

25  – are subject to a number of psychological and emotional forces that undermine their ability to

26  exercise self-restraint, and render them particularly susceptible to "encouragement" to drink to

27  excess.

28

58.    One of these reports by David Westol, who was CEO of his international fraternity for many years, is a well-known and respected expert and consultant to the Greek industry on risk management and hazing issues, and serves in a senior executive capacity on various Greek-related organizations, concludes that, in particular, the "big brother" ritual is one of the "Three Deadliest Nights" for prospective fraternity members.

59.    The "big brother" ritual, a ritual which for many years if not decades has been practiced in fraternities nationwide, in which the pledges are expected to consume alcohol provided by the big brother, is particularly deadly because of the unavoidable association between belonging and finishing what has been provided.  Historically, this ritual, unique to fraternities, has resulted in the deaths of numerous young pledges and likely thousands of incidents of dangerous, near-fatal intoxication.

60.    It is widely reported and well known among Greek organizations that at least one student has died in fraternity pledge activities *every year* since 1970.

61.    In 1997, the NIC passed a Resolution addressing the "misuse of alcohol" that, in part, "encourages its member fraternities to pursue alcohol-free chapter facilities."

62.    In 1998, the National fraternity, Phi Sigma Kappa, appointed a Senior Committee of its fraternity leaders to review the then-extant industry-wide research regarding the risks of alcohol and hazing and analyze the prevailing risk and crisis management programs implemented by Greek organizations.

63.    This PSK Senior Committee concluded that the risk management policy is "not unilaterally working.  There are still far too many incidents and violations, some of which involve chapters who are repeat offenders, sometimes occurring each semester."  PSK is insured through SAE's insurance company, James R. Favor, and the risk management policy that it identified as "not unilaterally working" remains substantially in effect.

64.    Others – researchers, insurance brokers, and purported experts regarding risk management issues for Greek organizations – also credit failures in the Greek organizations' risk management programs regarding crisis management, hazing, and alcohol for the high levels of injury and death related to Greek organizations and their bid, pledging and initiation "rituals"

EXHIBIT *b*, Pg. 16

1    including but not limited to the "big brother" traditions.

2        65.    SAE knew or, in the exercise of reasonable care should have known of the widely

3    publicized information, studies, and reports set forth in paragraphs 53 through 67, above.

4        66.    SAE establishes and controls the processes and procedures whereby students

5    become members of the fraternity by accepting a "bid" from the local chapter and participating

6    in various "pledge" and initiation events.

7        67.    In managing and controlling California Tau and its other chapters and members,

8    SAE, *inter alia*, promulgates risk management policies that are applicable to all chapters and

9    members, which policies purportedly prohibit hazing and underage alcohol consumption.

10       68.    Plaintiffs are informed and therefore believe, and on that basis allege, that prior to

11   the events that are the subject of this Complaint, various local chapters and members of SAE

12   have been involved in numerous hazing and/or misuse of alcohol and drug incidents. These

13   include, without limitation; sanctions issued in 2007 by Cal Poly against the SAE chapter as a

14   result of allegations by a female student that she was drugged with rohypnol (GHB) and raped by

15   a member of SAE; entry of a $16.2 million verdict against SAE arising out of the hazing death of

16   Tyler Cross at the University of Texas in 2006; the alcohol poisoning death of Jason Wren at the

17   SAE fraternity house at the University of Kansas in March, 2009; the death of an SAE member

18   from alcohol and drug overdose at the SAE fraternity house at SMU, and the prior

19   hospitalization and near death of another student on that campus, leading SMU officials to

20   conclude that drug use at the fraternity was part of the fraternity's activities; the death of

21   Benjamin Wynne in 1997 at Louisiana State University, who died, following the provision of

22   alcohol at Bid Night, with a blood-alcohol level 6 times the legal limit. Upon information and

23   belief, there are other serious injuries and deaths resulting from the activities by SAE and its

24   members.

### FIRST CAUSE OF ACTION

### (Survival and Wrongful Death)
### NEGLIGENCE
### FRATERNITY DEFENDANTS

28       69.    The allegations of Paragraphs 1– 68 are re-alleged and incorporated herein.

 EXHIBIT B, Pg. 17

70.     SAE, individually and through its agent, California Tau, and its officers and members, and California Tau owed a duty to Carson Starkey and the other pledges and fraternity members to manage and oversee the California Tau operations and the activities of the members in a reasonably prudent manner, and/or assumed such a duty.

71.     SAE, individually and through its agent, California Tau, and its officers and members, and California Tau also owed a duty to Carson Starkey and the other pledges and fraternity members to manage the provision and use of alcohol in connection with recruitment, pledge, Big Brother, and other initiation events in a reasonably prudent manner, and/or assumed such a duty.

72.     The Fraternity Defendants breached these duties, and were negligent, by, *inter alia:*

(a)     relying on underage, untrained members, who had themselves participated in bid, pledge, Big Brother, "Brown Bag," and/or other initiation events involving alcohol and who had taken oaths of secrecy and loyalty to the brotherhood, to manage California Tau and its activities and to enforce risk management policies;

(b)     failing adequately to train California Tau and chapter members and officers on risk management, alcohol policies, crisis management policies, and other management policies and procedures;

(c)     failing to provide effective supervision and control over the California Tau officers and members and the pledge activities and rituals authorized, directed, and/or participated in by those officers and members;

(d)     failing to implement reasonable measures to enforce risk management policies prohibiting the use of alcohol during all recruitment activities;

(e)     failing to provide reasonable safeguards and restrictions and controls in place to prevent underage drinking and excessive drinking, and responsible supervision of any underage persons serving alcohol to pledges;

EXHIBIT _B_, Pg.17

(f)    failing to implement reasonable measures to prohibit the excessive use and consumption of alcohol during recruitment and pledging activities including, but not limited to, the "big brother" and "brown bag" ritual;

(g)    failing to implement reasonable measures to enforce state laws, Cal Poly policies, and fraternity policies prohibiting underage drinking and hazing;

(h)    failing to implement reasonable measures to stop underage drinking and hazing activities which it knew, or should have known, were occurring within California Tau;

(i)    failing to discipline California Tau members for engaging in underage drinking, orchestrating and executing the "big brother" and "brown bag" ritual, and hazing activities; and

(j)    were otherwise negligent.

73.    As a direct and proximate result of Fraternity Defendants' negligence, Carson died, and his beneficiaries suffered and will suffer in the future financial support that Carson would have contributed to the family during their life expectancy; the loss of gifts and benefits that they would have expected to receive from Carson; funeral and burial expenses; the reasonable value of household services that Carson would have provided; the loss of Carson's love, companionship, comfort, care, assistance, protection, affection, society, moral support, and the loss of Carson's training and guidance.

74.    As a further direct and proximate result of Fraternity Defendants' negligence, the Estate of Carson Starkey incurred medical expenses and lost earnings.

75.    Fraternity Defendants are jointly and severally liable for their negligence that proximately caused Carson's death.

76.    The Fraternity Defendants have long known, or should have known, of the unparalleled dangers associated with the "big brother" and brown bag ritual, of hazing, alcohol abuse, and inept risk and crisis management within their and other fraternal organizations.

77.    Plaintiffs are informed and believe, and on that basis allege, that the Fraternity Defendants had available to them, possessed, or, in the absence of recklessness, should have

EXHIBIT B, Pg. 18

1   themselves performed or commissioned, the information and analyses about the risks of misuse

2   of alcohol and hazing, particularly in regard to bid, pledge, and initiation-related activities and

3   most particularly regarding the "big brother" and "brown bag" rituals.

4       78.    Plaintiffs are informed and believe, and on that basis allege that the Fraternity

5   Defendants knew for many years that their risk and crisis management policies were not working

6   because pursuant to those very policies unpaid, untrained, under-aged, and inexperienced college

7   students with conflicted loyalties were appointed and relied upon to make life and death

8   decisions and manage risks, student housing, and crises far beyond their experience, training and

9   understanding.

10      79.    Upon information and belief, for many years the Fraternity Defendants knew of

11  and deliberately failed despite known risks to supervise or implement reasonable controls over,

12  the traditions of California Tau, including the "big brother" and "brown bag" event, excess

13  alcohol consumption, and hazing, the types of activities that resulted in Carson's death.

14      80.    Because it was reasonably foreseeable that their acts and omissions as alleged

15  herein posed a risk of serious harm, Fraternity Defendants' misconduct was not only reckless but

16  also taken in conscious disregard of the danger posed by their acts and omissions, justifying the

17  imposition of punitive damages.

18      WHEREFORE, Plaintiffs pray for relief as set forth below.

19                          **SECOND CAUSE OF ACTION**

20                          **(Survival and Wrongful Death)**
        **VIOLATION OF PENAL CODE SECTION 245.6 ("MATT'S LAW")**
21                          **FRATERNITY DEFENDANTS**

22      81.    The allegations of Paragraphs 1– 80 are re-alleged and incorporated herein.

23      82.    Penal Code section 245.6 makes it illegal to haze, which is defined as "any

24  method of initiation or preinitiation into a student organization or student body, whether or not

25  the organization is officially recognized by an educational institution, which is likely to cause

26  serious bodily injury to any former, current, or prospective student of any school, community

27  college, college, university, or other educational institution in this state."

28

KERR
&
WAGSTAFFE
LLP

EXHIBIT B Pg. 19

1     83.    Section 245.6 provides a private right of action against any organization to which

2 the student is seeking membership "whose agents, directors, trustees, managers, or officers

3 authorized, requested, commanded, participated in, or ratified the hazing."

4     84.    The conduct of the individual defendants, members and officers of SAE and

5 California Tau, as alleged herein constituted a "method of initiation or preinitiation" which was

6 likely to cause serious bodily injury, was hazing within the meaning of the statute, and was a

7 proximate cause of Carson's death.

8     85.    The individual defendants who hazed Carson Starkey were acting as agents and/or

9 officers of the Fraternity Defendants.

10    86.    As a direct and proximate result of the Fraternity Defendants' violation of Matt's

11 Law, Carson died, and his beneficiaries suffered and will suffer in the future financial support

12 that Carson would have contributed to the family during their life expectancy; the loss of gifts

13 and benefits that they would have expected to receive from Carson; funeral and burial expenses;

14 the reasonable value of household services that Carson would have provided; the loss of

15 Carson's love, companionship, comfort, care, assistance, protection, affection, society, moral

16 support, and the loss of Carson's training and guidance.

17    87.    As a further direct and proximate result of the Fraternity Defendants' violation of

18 Matt's Law, the Estate of Carson Starkey incurred medical expenses and lost earnings.

19    88.    Fraternity Defendants are jointly and severally liable for their violation of Matt's

20 Law that proximately caused Carson's death.

21    89.    Plaintiffs are informed and believe, and on that basis allege, that before the events

22 that are the subject of this Complaint, the Fraternity Defendants knew or should have known that

23 it was reasonably foreseeable that pledges of California Tau were at risk for being hazed within

24 the meaning of Matt's Law.

25    90.    Because it was reasonably foreseeable that a violation of Matt's Law would

26 occur, Fraternity Defendants' misconduct was not only reckless, but also taken in conscious

27 disregard of the danger posed by their acts and omissions, justifying the imposition of punitive

28 damages.

EXHIBIT B Pg. 20

1    WHEREFORE, Plaintiffs pray for relief as set forth below.

2    //

3    //

### THIRD CAUSE OFACTION

**(Survival and Wrongful Death)**
**NEGLIGENCE PER SE (HAZING)**
**FRATERNITY DEFENDANTS**

7    91.    The allegations of Paragraphs 1 – 90 are re-alleged and incorporated herein.

8    92.    Hazing is prohibited by the Penal Code and by rules, regulations, and policies of

9    the California State University system and Cal Poly.

10    93.    The Defendants had a legal duty not to haze Carson.

11    94.    By engaging in the conduct alleged in this Complaint, the individual Defendants

12    breached their duty of care to Carson.  Under Evidence Code section 669(a), that breach of duty

13    is established as a matter of law because:

14        (a)    The individual Defendants' conduct violated Penal Code section 245.6 and

15    the rules, regulations, and policies of the California State University system and Cal Poly

16    as alleged above;

17        (b)    The individual Defendants' conduct proximately caused Carson's death;

18        (c)    The individual Defendants' conduct that caused Carson's death is conduct

19    of the nature that Penal Code 245.6 was designed to prevent; and

20        (d)    Carson was a student, and therefore one of the class of persons for whose

21    protection Penal Code section 245.6 and the rules, regulations, and policies of the

22    California State University system and Cal Poly were adopted.

23    95.    Plaintiffs are informed and believe and on that basis allege that the Fraternity

24    Defendants knew or should have known that local chapter members and officers engaged in the

25    hazing of pledges, including Big Brother and the "brown bag" event, and the abuse of alcohol

26    during bid, pledge, Big Brother and/or other initiation events, and that because this conduct was

27    considered a "traditional" part of attaining membership it was very likely to recur.

28    96.    Upon information and belief, for many years the Fraternity Defendants knew of,

EXHIBIT B, Pg. 21

1  and deliberately failed despite the known risks to supervise or implement reasonable measures to

2  control, hazing and the dangerous traditions at its chapters, including the provision of alcohol

3  during Big Brother Night events under circumstances constituting legal duress and likely to

4  cause serious bodily harm.

5     97.    The Fraternity Defendants breached their legal duty not to haze Carson and are

6  negligent *per se*.

7     98.    The Fraternity Defendants are liable for their own negligence *per se* and/or for the

8  negligence *per se* of their agents, the individual defendants, pursuant to the doctrine of

9  *respondeat superior*, because the individual defendants were acting as agents of the Fraternity

10  Defendants and within the scope of their agency at all relevant times, and/or because the

11  misconduct alleged is of the type to which *respondeat* liability attaches even if the agent was

12  acting outside the scope of the agency, and/or because the Fraternity Defendants ratified the

13  individual fraternity member defendants' misconduct.

14     99.    As a direct and proximate result of the Defendants' negligence *per se,* Carson

15  died, and his beneficiaries suffered and will suffer in the future financial support that Carson

16  would have contributed to the family during their life expectancy; the loss of gifts and benefits

17  that they would have expected to receive from Carson; funeral and burial expenses; the

18  reasonable value of household services that Carson would have provided; the loss of Carson's

19  love, companionship, comfort, care, assistance, protection, affection, society, moral support, and

20  the loss of Carson's training and guidance.

21     100.    As a further direct and proximate result of the Defendants' negligence *per se*, the

22  Estate of Carson Starkey incurred medical expenses and lost earnings.

23     101.    Fraternity Defendants' are jointly and severally liable for their negligence *per se*

24  that proximately caused Carson's death.

25     102.    Because it was reasonably foreseeable that a hazing would occur at California Tau

26  chapter, Defendants Sigma Alpha Epsilon and the California Tau Chapter of Sigma Alpha

27  Epsilon's misconduct was not only reckless, but also taken in conscious disregard of the danger

28  posed by their acts and omissions, justifying the imposition of punitive damages.

EXHIBIT B, Pg. 22

1    WHEREFORE, Plaintiffs pray for relief as set forth below.

2    //

3    //

4    ### FOURTH CAUSE OF ACTION

5    **(Survival and Wrongful Death)**
     **NEGLIGENCE/BREACH OF ASSUMED DUTY**
6    **ALL DEFENDANTS**

7    103.   The allegations of Paragraphs 1 – 102 are re-alleged and incorporated herein.

8    104.   Through their actions and promises to act, the individual defendants undertook to
9    care for Carson, and to render services that were reasonably calculated to prevent Carson's
10   injuries and death.  The individual defendants thereby assumed the duty to reasonably care for
11   Carson.

12   105.   The individual defendants breached these duties by, *inter alia*:

13       (a)   Failing to procure for Carson appropriate medical care and other care after
14   it became clear that Carson was injured, intoxicated, helpless, or in need of medical
15   attention;

16       (b)   Returning Carson to 551 Highland Drive rather than proceeding to a
17   hospital or other medical facility, which was just a short distance away;

18       (c)   Abandoning Carson without getting him assistance or medical care and
19   attention;

20       (d)   Unreasonably delaying a call to 911 or other emergency personnel;

21       (e)   Subjecting Carson to amateur care from unqualified individuals, some of
22   whom were intoxicated; and

23       (f)   Preventing others from obtaining the medical care Carson needed under
24   the circumstances by, among other reasons, placing Carson in a utility room where his
25   need for immediate medical care would neither be detected nor responded to.

26   106.   The Fraternity Defendants are liable for the individual defendants' negligent acts
27   and omissions as alleged herein pursuant to the doctrine of *respondeat superior* because the
28   individual defendants were acting as agents of the Fraternity Defendants and within the scope of

KERR
&
WAGSTAFFE
LLP

FIRST AMENDED COMPLAINT

EXHIBIT B Pg. 23

1  their agency at all relevant times, and/or because the misconduct alleged is of the type to which

2  *respondeat* liability attaches even if the agent was acting outside the scope of the agency, and/or

3  because the Fraternity Defendants ratified the individual defendants' misconduct.

4        107.    As a direct and proximate result of the Defendants' breach of their assumed

5  duties, Carson died, and his beneficiaries suffered and will suffer in the future financial support

6  that Carson would have contributed to the family during their life expectancy; the loss of gifts

7  and benefits that they would have expected to receive from Carson; funeral and burial expenses;

8  the reasonable value of household services that Carson would have provided; the loss of

9  Carson's love, companionship, comfort, care, assistance, protection, affection, society, moral

10  support, and the loss of Carson's training and guidance.

11        108.    As a further direct and proximate result of the Defendants' breach of their

12  assumed duties, the Estate of Carson Starkey incurred medical expenses and lost earnings.

13        WHEREFORE, Plaintiffs pray for relief as set forth below.

14                **FIFTH CAUSE OF ACTION**

15            **(Survival and Wrongful Death)**
    **NEGLIGENCE/BREACH OF DUTY TO PREVENT HARM**

16                  **ALL DEFENDANTS**

17        109.    The allegations of paragraphs 1 – 108 are re-alleged and incorporated herein.

18        110.    The individual defendants knew or had reason to know that by their conduct, they

19  had caused harm to Carson so as to make him helpless and in a position of peril, and they

20  therefore owed Carson a duty to exercise reasonable care to prevent further harm.

21        111.    The individual defendants breached this duty by, *inter alia*:

22        (a)    Failing to procure for Carson appropriate medical care and other care after

23  it became clear that Carson was injured, intoxicated, helpless, or in need of medical

24  attention;

25        (b)    Returning Carson to 551 Highland Drive rather than proceed to a hospital

26  or other medical facility, which was just a short distance away;

27        (c)    Abandoning Carson without getting him assistance or medical care and

28  attention;

EXHIBIT B, pg 2

1    (d)    Unreasonably delaying a call to 911 or other emergency personnel;

2    (e)    Subjecting Carson to amateur care from unqualified individuals, some of

3    whom were intoxicated; and

4    (f)    Preventing others from obtaining the medical care Carson needed under

5    the circumstances by, among other reasons, placing Carson in a utility room where his

6    need for immediate medical care would neither be detected nor responded to.

7    112.    The Fraternity Defendants are liable for the acts and omissions of the individual

8    defendants' negligent acts and omissions as alleged herein pursuant to the doctrine of *respondeat*

9    *superior* because the individual defendants were acting as agents of the Fraternity Defendants

10    and within the scope of their agency at all relevant times, and/or because the misconduct alleged

11    is of the type to which *respondeat* liability attaches even if the agent was acting outside the scope

12    of the agency, and/or because Fraternity Defendants ratified the individual defendants'

13    misconduct.

14    113.    As a direct and proximate result of the Defendants' breaches of their duty to

15    prevent harm, Carson died, and his beneficiaries suffered and will suffer in the future financial

16    support that Carson would have contributed to the family during their life expectancy; the loss of

17    gifts and benefits that they would have expected to receive from Carson; funeral and burial

18    expenses; the reasonable value of household services that Carson would have provided; the loss

19    of Carson's love, companionship, comfort, care, assistance, protection, affection, society, moral

20    support, and the loss of Carson's training and guidance.

21    114.    As a further direct and proximate result of the Defendants' breaches of their duty

22    to prevent harm, the Estate of Carson Starkey incurred medical expenses and lost earnings.

23    WHEREFORE, Plaintiffs pray for relief as set forth below.

24    **PRAYER**

25    WHEREFORE, Plaintiffs pray for relief as follows:

26    1.    Compensatory damages in an amount to be proven at trial;

27    2.    Punitive and exemplary damages pursuant to California Civil Code section 3294

28    and as permitted by law;

KERR
&
WAGSTAFFE
LLP

EXHIBIT B Pg. 25

3.   Costs and expenses;

4.   Such other relief as the Court deems just and proper, including equitable relief.


DATED: March ___, 2011                    **BODE & GRENIER, LLP**

                                          **KERR & WAGSTAFFE LLP**


                              By   _____
                                   IVO LABAR
                                   Attorneys for Plaintiffs
                                   H. SCOTT STARKEY and JULIA K. STARKEY


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.


DATED: March ___, 2011                    **BODE & GRENIER, LLP**

                                          **KERR & WAGSTAFFE LLP**


                              By   _____
                                   IVO LABAR
                                   Attorneys for Plaintiffs
                                   H. SCOTT STARKEY and JULIA K. STARKEY

EXHIBIT B Pg 2k

1   IVO LABAR (203492)
    KELLY A. CORCORAN (260268)
2   **KERR & WAGSTAFFE LLP**
    100 Spear Street, Suite 1800
3   San Francisco, CA 94105-1528
    Telephone: (415) 371-8500
4   Fax: (415) 371-0500

5   DOUGLAS E. FIERBERG (*pro hac vice*)
    MARIAN RIEDY (*pro hac vice*)
6   **BODE & GRENIER, LLP**
    1150 Connecticut Avenue NW, Ninth Floor
7   Washington, DC 20036
    Telephone: (202) 828-4100
8   Fax: (202) 828-4130

9   STEVEN J. ADAMSKI (103977)
    DAVID C. CUMBERLAND (93719)
10  **ADAMSKI MOROSKI MADDEN & GREEN LLP**
    Mailing Address: Post Office Box 3835
11  San Luis Obispo, California 93403-3835
    Physical Address: 6633 Bay Laurel Place
12  Avila Beach, California 93424
    Telephone: (805) 543-0990
13  Fax: (805) 543-0980

14  Attorneys for Plaintiffs
    H. SCOTT STARKEY and JULIA K. STARKEY

15

16              **SUPERIOR COURT OF CALIFORNIA**

17              **COUNTY OF SAN LUIS OBISPO**

18

19  H. SCOTT STARKEY and JULIA K.          Case No. CV 090534
    STARKEY,
20                                          Assigned for all purposes to:
                Plaintiffs,                 Honorable Charles S. Crandall
21
        vs.                                 **[PROPOSED] ORDER GRANTING**
22                                          **PLAINTIFFS' MOTION FOR LEAVE**
    SIGMA ALPHA EPSILON FRATERNITY, *et*    **TO FILE FIRST AMENDED**
23  *al.*,                                  **COMPLAINT**

24              Defendants.
                                            DATE: March 3, 2011
25                                          TIME: 9:00 am
                                            DEPT: 9
26
                                            TRIAL: September 19, 2011
27

28

KERR
&
WAGSTAFFE
LLP
              [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED
                                            COMPLAINT

EXHIBIT _B_ Pg 2'

## PROPOSED] ORDER

Plaintiffs allege that, through discovery, they have learned about defendant SAE's efforts to limit the exposure of the organization's assets through a structure of various entities and organizations. Plaintiffs have also learned that the SAE Chapter they initially sued was the Chapter operating at Cal Poly, Pomona, rather than the appropriate Chapter at Cal Poly, San Luis Obispo. They seek to file a First Amended Complaint to correct this mistake, to substitute various entities as defendants, and to allege the details of the alter ego relationships.

Under CCP § 473, the Court's discretion to allow amendment of pleadings is liberally exercised. Weil & Brown, Cal. Prac. Guide, Civil Pro. Before Trial (TRG 2010) § 6:638, citing Nestle v. Santa Monica, 6 Cal. 3d 920, 939 (1972), Mabie v. Hyatt, 61 Cal. App. 4th 581, 596 (1998).

The proof of service of notice of the motion and moving papers is in order. No opposition has been filed. The failure of any interested party to file opposition is a tacit admission that the motion is meritorious and should be granted. Weil & Brown, Cal. Prac. Guide, Civil Pro. Before Trial (TRG 2010) § 9:105.10.

IT IS HEREBY ORDERED THAT:

Plaintiffs' motion is GRANTED. The Proposed First Amended Complaint attached hereto as Exhibit A is deemed filed and served as of this date.

Dated: _____, 2011        _____

HONORABLE CHARLES S. CRANDALL
JUDGE OF THE SUPERIOR COURT

[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

KERR
&
WAGSTAFFE
LLP

EXHIBIT B Pg. 28